## DAM v. KIRKE LA SHELLE CO.

(Circuit Court, S. D. New York. December 12, 1908.)

1. COPYRIGHTS (§ 23*)—LITERARY PRODUCTION—RIGHTS OF PURCHASER.

Under Rev. St. § 4952 (U. S. Comp. St. 1901, p. 3406), giving authors the right to translate and dramatize their literary productions, and providing that proprietors or owners by assignment, on complying with the statute, shall have the exclusive right of printing and vending, the unconditional sale of a story entitled the purchaser to protection from piracy on securing a statutory copyright.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 22; Dec. Dig. § 23.*]

2. COPYRIGHTS (§ 27*)—LITERARY PRODUCTION—PUBLICATION.

Where the publishers of a magazine purchased and published a story in a number of a magazine, they secured the copyright on the story by merely filing with the librarian of Congress the title page of the magazine and complying with the statute regulating copyrights, without filing a copy of the title of the story so published, or of the story.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 25, 26; Dec. Dig. § 27.*]

3. COPYRIGHTS (§ 38*)—LITERARY COMPOSITION—DRAMATIZATION.

Where a story printed in a magazine was copyrighted with other material in the magazine, it was not necessary that the author should himself secure a copyright, to retain the right of dramatization not sold to the magazine publishers.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 38.*]

4. COPYRIGHTS (§ 36*)—RIGHTS TO PUBLISH AND DRAMATIZE.

An author may sell the exclusive right to print and publish his production, giving the buyer the right to copyright it, while the author withholds to himself the right to dramatize.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 36.*]

5. COPYRIGHTS (§ 44*)—PUBLICATION—ASSIGNS.

Where an author sold the right to print and publish his production, with the right to copyright it, but impliedly retained the right to dramatize, the publishers could assign all the rights secured by their statutory copyright, after publication, to the author, his heirs and assigns.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 42; Dec. Dig. § 44.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. COPYRIGHTS (§ 55*)—DRAMATIZATION OF STORY—INFRINGEMENT.

In a suit to restrain a dramatic production as an infringement of an author's copyrighted story, the question of infringement depends on whether the substance of the literary composition has been taken, to complainant's injury.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 55.*]

7. COPYRIGHTS (§ 55*)—INFRINGEMENT—DRAMATIZATION.

The author of a copyrighted story is not entitled to restrain a dramatic production thereof, if the story is merely an old theme or subject with a new dress or coloring; but if the composition or the subject thereof is dramatized without the author's consent, and is produced by a dialogue, and scenes and incidents are introduced, with stage situations, by which the kernel of the story is emphasized, there is an infringement, against which equity will grant relief.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 55.*]

8. COPYRIGHTS (§ 88*)—INFRINGEMENT—DRAMATIZATION—QUESTION OF FACT.

Whether there is substantial similarity between a copyrighted literary composition and a dramatization thereof is a question of fact.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 88.*]

9. COPYRIGHTS (§ 83*)—INFRINGEMENT—EVIDENCE.

Evidence *held* to warrant a finding that the play entitled "The Heir to the Hoorah" is an infringement on the copyrighted story entitled "The Transmogrification of Dan," under the rule that it is sufficient if the essence of a play is taken for an original literary production.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 83.*]

10. COPYRIGHTS (§ 86*)—INFRINGEMENT—DRAMATIZATION—DECREE.

Where a play constituting an infringement of a copyrighted novel had been staged at great expense, with elaborate scenery, stage effects, etc., the entire play would not be enjoined, if it could be revamped, so as to eliminate the objectionable imitations.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 80; Dec. Dig. § 86.*]

Andrew Gilhooly, for complainant.

Stover, Hall & Freeman (Joseph E. Freeman and Martin L. Stover, of counsel), for defendant.

HAZEL, District Judge. This suit in equity was brought to restrain the defendant, the Kirke La Shelle Company, from producing or publicly performing the dramatic play or composition entitled "The Heir to the Hoorah." The bill alleges that the play is an unauthorized dramatization of the published story entitled "The Transmogrification of Dan."

It is first to be considered herein whether the story was protected by statutory copyright. Complainant's intestate, who was the author of the story, sold it to the Ess Ess Publishing Company, which later published the story, with other articles, in its copyrighted number of the Smart Set issued September, 1901. After the alleged infringement of the novelette the publishing company assigned back to the author its copyright of the September issue of the magazine; the assignment, however, simply covering and including the story or novelette in controversy, together with all claims and demands against infringers thereof. The defendant contends, first, that to secure a valid copyright of his authorship and the exclusive right to dramatize, the author must

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

have copyrighted the literary production, or the copyright must have been taken out by the purchaser; and, second, that there was no sale of the copyright, but simply of the manuscript or literary composition.

But this contention is not thought maintainable, for by section 4952 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 3406), not only authors have the right to translate and dramatize their literary productions, but proprietors or owners by assignment, upon complying with the statute, are given the exclusive right of printing and vending the same. The unconditional sale of the story entitled the purchaser to protection from piracy upon securing a statutory copyright, and, moreover, it could be and was in fact copyrighted by the owner thereof by simply filing with the Librarian of Congress the title page of the magazine and complying with the provisions of the statute relating to copyrighting. It was not necessary to file a copy of the title of each article published in the magazine, or of the author's literary composition; nor was it necessary that he should himself have secured the copyright, so as to retain the right of dramatizing it. It was properly held in a recent case decided in this circuit by Judge Holt that an author can sell the exclusive right to print and publish his production, the buyer thereby having the right to copyright it, though the author may withhold to himself the right to dramatize. Ford v. Blaney Amusement Co. (C. C.) 148 Fed. 642. Hence in the present case the sale or transfer of the literary composition prior to copyrighting vested the Ess Ess Publishing Company, in the absence of any reservation, with all the rights and privileges of the author, and gave it the right to secure the statutory copyright, which thereafter it could assign to the author, his heirs or assigns.

The next important question relating to the dramatization of the copyrighted literary composition by the defendant without the consent of the proprietor requires us to ascertain whether the subject or so-called plot of the story or novelette was original, and whether the defendant, in producing the play or drama, abstracted a material portion thereof. In cases of this character the inquiry must be whether the substance of the literary composition has been taken to the injury of the complainant. Of course, if the plot or the language used by the author to develop the subject of the literary composition or the combination of incidents narrated therein was not new, or if its principal feature has been previously published, either in the form of a novel, story, or play, the complainant would not be entitled to the relief demanded; for in such case the author merely gave a new dress or coloring to an old theme or subject. But if the copyrighted literary composition, or the theme or subject thereof, was dramatized by another without the consent of the author, and reproduced by dialogue spoken by play actors, and scenes and incidents are introduced, coupled with stage situations, by which the kernel of the literary composition is emphasized, then it may be fairly supposed that the playright, in giving a public performance of the drama, endeavored to reap a profit or gain out of another's industry, against which a court of equity has power to grant relief.

Whether there is a substantial similarity between the copyrighted literary composition and the play performed by the defendant is a

question of fact, and the court has found comparison helpful to a decision. The expert witness for the plaintiff testifies that the theme or subject of the story is the change of the disposition and character of "Dan," the central figure, from a man of submissive temperament in his household and towards his wife and mother-in-law to a man of commanding and asserting mien upon his becoming a father. From this idea or conception the author of the literary composition, by his descriptive ability and by virtue of the use of apt words, has succeeded in developing different characters, causing them to perform separate functions, and helping to emphasize the central idea that, "Dan" becoming a father, his previous self-abnegation, his effacement or submissiveness, was at an end, making it instantly warrantable on his part to peremptorily assert his rights as the father of his child and protector of his home. This subject or theme of the copyrighted story is substantially imitated in the defendant's play. No other play, drama, or literary production is called to my attention, and I have examined the exhibits in evidence, from which it may be ascertained that the subject of the author's composition, together with the various characters which give it prominence, was not original.

It is true the dialogue of the drama is not in the words of the copyrighted story; but its exact phraseology was not necessary to the adaptation of the plot or subject, or the portrayal of the different characters to the play. The actors in the play "The Heir to the Hoorah" portray or imitate the characters in the copyrighted story, and in addition thereto make use of incidents and situations which apparently give expression to the central theme or purpose of the author. Whatever of addition has been introduced in the play does not obscure or emasculate the central figure of the story, namely, the rejuvenate husband. The copyrighted story was not strictly a dramatic composition, although its special features, its incidents, personages, and episodes, plainly indicated that it was not without dramatic interest and could, by appropriate dialogue, scenes, and stage business, be translated or expanded into a drama. It is enough if the essence of a play is taken from an original literary production, and it is held that one or more chapters of a novel are to be regarded as a dramatic composition. Drone on Copyright, p. 589. The playright of "The Heir to the Hoorah," as already stated, has expanded the plot of the story, using different words. He has introduced additional characters. He has cleverly staged the play, and by the use of language and characters has given the subject of the story an excellent interpretation. But all this is unimportant, if he has taken, as I think he has, the substance of complainant's authorship. Emerson v. Davies, 3 Story, 768, Fed. Cas. No. 4,436; Drone on Copyright, p. 433. The playright has testified that he did not use the plot or theme contained in the copyrighted story, but that the plot of the play was originated by him. Evidence has been introduced to show that the incidents and situations were familiarly known. But, giving weight to the testimony of complainant's witness Mrs. Norris, it would seem to be established that the playright, without first obtaining the permission of the author or proprietor, plagiarized and imitated the complainant's copyrighted literary composition.

The theatrical production above mentioned has been staged at great

expense, and the elaborate scenery, stage effects, translation of the story into a dramatic composition, were the result of such valuable services and skill by the defendant that the court would hesitate to grant relief by injunction against the entire play, were it not that the pivotal feature of the play or the objectionable parts are seemingly inseparable from the theme of the story, and therefore, adopting the general rule in such cases, the said play or drama containing the literary matter which is the subject of this controversy must be enjoined. Probably the play or drama can be revamped to eliminate the aforesaid objectionable imitations. If such is the fact, and this may be shown on settlement of the restraining order, the injunction will simply cover such objectionable portions.

Let complainant enter a decree in conformity with this decision, with costs.