## GROPPER v. WARNER BROS. PICTURES, Inc.

District Court, S. D. New York.

Jan. 27, 1941.

Maurice V. Seligson, of New York City, for plaintiff.

Robert W. Perkins, of New York City (Joseph D. Karp and Stanleigh P. Friedman, both of New York City, of counsel), for defendant.

SYMES, District Judge.

This is an action under the copyright law. The plaintiff claims that he wrote an original dramatic composition entitled "Ex-Racketeer," a new play, containing a large amount of material wholly original with the complainant, which he copyrighted October 24, 1934, thereby securing the exclusive rights and privileges to the said composition.

He then alleges the respondent infringed said copyright by producing and placing upon the market a talking motion picture entitled "Alcatraz Prison," copied, according to the plaintiff, largely from the complainant's copyrighted dramatic composition aforesaid entitled "Ex-Racketeer."

The usual relief is prayed for.

The Court, in the presence of counsel for both sides, viewed the defendant's motion picture "Alcatraz Prison" at the defendant's studio. I have heard the evidence; observed the witnesses on the stand; read the depositions and the plaintiff's play; and having heard the arguments of counsel feel fully advised.

The defendant's proof establishes that Crane Wilbur, a writer, discussed with Brian Foy, a director and producer of motion pictures employed by the defendant Warner Brothers, the idea of writing a motion picture featuring, as a background, the well known Federal penal institution, Alcatraz Island; preliminary thereto Mr. Wilbur and an associate made a trip to San Francisco and interviewed Mr. Johnson, the Warden of the prison at Alcatraz Island. There is also testimony that they made a research of all literature concerning Alcatraz Island, reading many articles, one in the "Saturday Evening Post," accounts of the Al Capone trial, and actually visited the Island, although they were unable to get inside the walls of the prison proper.

The Court takes judicial notice of the fact that in 1934, the time this motion picture was written, Alcatraz Prison and its reputation as a place of incarceration of so-called public enemies and other desperate characters convicted in the Federal courts, was uppermost in the public mind; it is easy to see the public appeal it had for a motion picture or play.

The main theme underlying both stories is old and one any habitue of the theatre or moving pictures is familiar with. It has been portrayed many times on the stage and screen: It is the story of a parent successfully engaged in a questionable business, the successful pursuit of which gives him an assured income; such a person is called a "racketeer" and is always portrayed as a "straight" criminal, so-called, of clean personal habits and morals, compelled by his very business to associate with underworld characters of the so-called gangster type with a different code that are given so much publicity in the public press, including the accounts of the many sensational investigations and trials in the courts of the land. The character always has a child or relative he loves and keeps separate and apart from his life, in many cases, as in the two stories here, it is a daughter kept in fashionable boarding schools in order to avoid having any contact with the parent, his associates, or opportunity to learn about the parent's business source of income or associates. There is engendered in the parent in the case at bar, as well as in plaintiff's play the laudable motive and desire, having made a fortune, to get out of the underworld business, become acquainted with his child, and going to Europe or a new environment to live down his past and devote his time and fortune to the child.

This idea or theme is in the public domain not copyrightable under the authorities as I read them. The question is whether the expression or treatment of the idea in the defendant's motion picture, the characters and the dialogue, infringes plaintiff's treatment in his play "Ex-Racketeer" which, according to the testimony, was never produced.

I am convinced on this record that both authors made use of a common fundamental plot, but that the stories are different in their main features: In the plaintiff's story no attempt is made to capitalize upon "Alcatraz Prison," or the treatment or life of the prisoners incarcerated therein, or in any other penal institution for that matter. The defendant's motion picture depicts the life and treatment of prisoners in that institution, and is designed to attract and cater to the public curiosity concerning that well known institution so well advertised in the public press.

Gat Brady, the defendant's chief character, desires to give up his life as a successful industrial racketeer. He maintains his daughter separate and apart from himself in a fashionable boarding school. The headmistress of the school, informs him by phone that his name is so well known that it not only reflects upon his daughter, but upon the school as well, and therefore she requests his daughter's removal. He plans to join his daughter and take her to Europe. On the eve of their sailing he is arrested by the Federal authorities on a charge of income tax evasion, thus bringing into the picture or plot the story of Al Capone, the well known criminal character who served time at Alcatraz for a similar offense. After negotiating with the Federal authorities who, Gat's lawyer informs him, can't be fixed, he makes an agreement with the District Attorney to take a short sentence, pay a big fine, and thus clear his record. This agreement, however, as in the Capone case is not recognized by the Court, and he is sentenced to five years in the penitentiary, and is incarcerated at Leavenworth. There he meets one of his own mobsters with whom he had had an altercation; the result of an old feud. A physical conflict ensues between the two, and Gat is transferred to Alcatraz. Red, the Mobster contrives by violating prison rules at Leavenworth, to get transferred to Alcatraz. At Alcatraz an old enemy of Red's meets up with him, and expresses to other prisoners his hatred of Red. A convenient opportunity occurs for this prisoner to stab Red, who dies claiming that Gat is his murderer, Gat's knife having been used to commit the murder. As a result of a confession of Red's murderer made to a Federal stool pigeon passing off as a prisoner in the penitentiary, Gat, who was about to be convicted of the murder, is found not guilty. His daughter stands by him most loyally, shows no revulsion when she meets her father, knowing his unsavory record and does all she can to help him in his subsequent troubles. In this she is greatly aided by the young assistant district attorney responsible for Gat's conviction, and who, through his love for the daughter, does all he can to have Gat's good time lost as a result of his altercation in Leavenworth Penitentiary restored. The motion picture ends with Gat returning to Leavenworth to finish out the short time remaining to be served, following the restoration of his good time off, and with the distinct impression left that in a short time he will be out reunited with his daughter who will marry her boy friend, the assistant district attorney.

The plaintiff's treatment is entirely different: "Straight" Davis, "the hero" so-called, has a daughter sheltered in a boarding school in California. The entire story is one scene laid in the back room of a notorious night club that he is the proprietor of. When the daughter appears she has full knowledge of her father's occupation and source of income, and it does not take her very long to size up the characters he associates with, one, called Spanish, a mobster; another, a girl named Dixie Dare, properly described as a common prostitute, is very devoted to "Straight". "Straight" is very anxious to shield his daughter from knowledge of his business source of income and associates. The daughter learns of her father's occupation; suddenly calls upon him in his office. Her real character is quickly disclosed, she stating that at school she was always breaking rules, going off on sprees, and was different from the other girls. As a result of her own desire and the suggestion of Spanish, the mobster, with whom her father has a feud over a large gambling debt Spanish owes "Straight", she immediately becomes intoxicated, leaves the scene with Spanish, crosses the state line into Maryland, and marries him; returns in a drunken condition and describes the trip and marriage to the assembled multitude of choice gangsters in her father's office. Her reactions upon learning of her father's life are entirely different from that of Gat Brady's daughter in "Alcatraz". The latter, upon obtaining this information, remains loyal and devoted, and when he is sent to prison, en-

lists in his service, and is very helpful in his final redemption and release from prison.

I am convinced that while both authors consciously or unconsciously made use of a common fundamental plot, the stories told are not the same. There is a material difference in the characters and the episodes necessarily required in describing the gangster operations so familiar to the public. The fundamental plot, however, is the same, and of course is not copyrightable under the law. And the statute does not and can not give the plaintiff a monopoly of ideas, merely protecting the means of expressing the idea.

The defendant's modes of expression are entirely different from those found in the plaintiff's play "Ex-Racketeer" even though access but not use on the part of the defendant is admitted.

There is no claim of any similarity in dialogue, and the story told by Mr. Wilbur, the defendant's author, of how he conceived and built up his picture is plausible and not contradicted in its main points.

After developing the main theme of the play, as described, the defendant's author immediately switches to the Al Capone-Alcatraz story and his picture is a distinct attempt to capitalize on those two incidents which, in 1934, everyone recalls, were uppermost in the public mind, and resulted in a big demand for gangster stories which was met by newspapers and magazines including the exploitation of the series of so-called gangster trials and plays and movies at that time.

As stated, the scene of the plaintiff's play is a room in the rear of a dive run by the plaintiff's racketeer, "Straight" Davis. There is no exploitation of a prison; and while there is some reference to the fact that "Straight" Davis is in trouble with the Federal authorities as a result of his failure to pay income taxes, the theme is not at all developed, but dropped after only one or two minor references thereto. There is no prison scene; no trial scene, or any of the usual background of a gangster trial that the public is used to.

The characters of the two daughters are entirely different: "Straight" Davis' daughter is vindictive, and her reaction upon learning of her father's deceit and her disillusionment, is entirely different from that of the daughter of Gat Brady. The former gets drunk and goes off with her father's enemy, Spanish, and marries him; there is no seduction. The ages of the two girls are different. Gat Brady's trip to Europe with his daughter is thwarted by the principal event of the picture, namely, his arrest, conviction and sentence to a Federal prison for income tax violation. "Straight" Davis' trip to Europe is thwarted by his murder by his newly-acquired son-in-law his pet aversion Spanish, who marries his daughter obviously to get control through her of her father's vast fortune which the story discloses has been cached away in safety deposit boxes. Upon marrying the daughter he promptly returns and pays a very large sum of money to "Straight" in settlement of the old gambling account, which "Straight" has insisted he pay, and which resulted in the feud between the two former partners.

For the reasons stated, I conclude the defendant, though it had access perhaps to the plaintiff's story and made a synopsis thereof for its files, is not guilty of plagiarism; has taken nothing from the plaintiff's story; that while the idea is the same, the similarity extends only to the extent necessary to develop the usual gangster type of story; that the characters are different; react differently in the important situations of the stories.

Therefore I make general findings of fact in favor of the defendant and against the plaintiff. Findings of fact and conclusions of law in defendant's favor dismissing the bill with costs may be submitted.