[L. A. No. 20699. In Bank. August 4, 1950.]

SAMUEL R. GOLDING et al., Respondents, v. R.K.O.
PICTURES, INC. (a Corporation) et al., Appellants.

Mitchell, Silberberg & Knupp and Guy Knupp for Appellants.

Loeb & Loeb and Herman F. Selvin, Amici Curiae on behalf of Appellants.

Harold A. Fendler for Respondents.

EDMONDS, J.—In an action for the infringement of literary property, the producers of a motion picture appeal

from a judgment awarding the authors of the assertedly plagiarized stage play damages in the sum of $25,000. The sufficiency of the evidence to support the judgment is the principal question presented for decision.

Samuel R. Golding and Norbert Faulkner, both well-established writers, collaborated in writing a play entitled, "The Man and His Shadow." They neither published nor dedicated it to the public and it was not copyrighted. The Pasadena Playhouse produced the play in December, 1942.

After the authors made some revisions, they submitted it to R.K.O. Radio Pictures, Inc., and Val Lewton, a producer. Lewton retained the manuscript for about six weeks. At that time, according to the evidence, Lewton was looking for a story with the action on board a ship in order to utilize an old set which was available. The appellants admit access to the play in that a copy of it was in the custody of Lewton for some time.

In August, 1943, the appellants released the motion picture entitled "The Ghost Ship" and this action followed. Upon the trial, the play was read to the jurors and the motion picture was shown to them. After they returned a verdict for damages in the amount of $25,000, a motion for judgment notwithstanding the verdict was denied. The appeal is from the judgment and from the order denying the motion.

The central dramatic situation or core in which the plaintiffs claim property is as follows: The action takes place on board a ship. Only one person aboard, a passenger, suspects the captain of being a murderer. He accuses the captain who neither admits nor denies the accusation; in fact, to his crew and passengers the captain clearly implies that his accuser is either guilty of hallucinations or himself desires to kill him. The accuser knows that he is subject to the captain's whims and is in a position where he can be killed or imprisoned. The captain, sure of his authority, informs the accuser that he is free to try to convince anyone on board ship of the truth of his suspicions. The passenger tells his story to the first mate and to others on the ship but they refuse to believe him and instead suspect the passenger of hallucinations or malice. Finally, however, the captain becomes aware that he is suspected by at least one other person and he threatens to kill, or does kill that person as an intermeddler. Knowledge that his murders are about to be uncovered causes him to lose his mind and brings about his own undoing and death.

In the plaintiffs' play this basic dramatic core was filled out by placing the passengers and crew upon a pleasure cruise and making the captain an imposter who has come to show his superiority to the man in whose shadow he has worked for years. This man is the person throughout who knows the captain's true identity. There are various other subcharacters who give body and filling to the central plot, but as testified to by both Golding and Faulkner, this matter was all superficial and could be changed in innumerable ways without affecting the literary property and its value.

The moving picture "Ghost Ship" has its captain as the dominant figure of the story. The locale of the drama is on a freighter with members of the crew having the subordinate roles. The ship carries no passengers and, to that extent, the minor characters are quite different from those in the play. However, the captain and his obsession with authority and the fact that no one aboard can successfully challenge his position is found in the picture, as is the dramatic struggle between the captain and his adversary, the one person who knows his true nature. Basically, the psychological situation is that described by the plaintiffs as the dramatic core of their work.

The producers contend that the evidence does not support the finding of plagiarism. The correct standard for making a comparison between the play and the picture, they assert, is that of an ordinary observer; if dissection, rather than observation, is necessary to determine the question of similarity, a finding of infringement is unwarranted. They also claim that the evidence is insufficient to support the award of damages. In answer, the respondents argue that "whether or not similarities are apparent to an 'ordinary observer' and support a finding of copying is a question of fact upon which the jury's unanimous determination is conclusive."

The rights asserted in this case are not based upon statutory copyright but stem from the so-called common-law copyright. (Civ. Code. § 980.) Upon such a cause of action, to recover for infringement, or piracy, of literary property, three elements must be established: (1) ownership by the plaintiff of a protectible property interest; (2) unauthorized copying of the material by the defendant; and (3) damage resulting from the copying. (See *Caruthers* v. *R.K.O. Radio Pictures, Inc.*, 20 F. Supp. 906, 907.)

Literary property in the fruits of a writer's creative endeavor extend to the full scope of his inventiveness. This may well include, in the case of a stage play or moving picture

scenario, the entire plot, the unique dialogue, the fundamental emotional appeal or theme of the story, or merely certain novel sequences or combinations of otherwise hackneyed elements. ▇ It is, however, only the product of the writer's creative mind which is protectible. If only a portion of the play or story is original and the remainder is but an orthodox collection of filler comprising matters in the public domain, the property right must be fully analyzed and closely defined, because in the subsequent determination of the issue of copying, it is necessary to make a comparison of the two works, and such comparison is of value only if it is based upon a correct determination of the issue as to the extent and nature of the plaintiff's protectible interest.

The question as to whether the claimed original or novel idea has been reduced to concrete form is an issue of law. The determination of it must be made as a condition precedent to the vesting of any rights stemming from the common law copyright. The plaintiff must establish, as the subject of the cause of action, a right in the nature of property which is capable of ownership. Certainly, if the only product of the writer's creative mind is not something which the law recognizes as protectible, that is, an idea not reduced to concrete form (*O'Brien* v. *R.K.O. Radio Pictures*, 68 F.Supp. 13), no right of action for infringement of literary property will lie even if the idea assertedly infringed is original and the result of his independent labor.

▇ After a plaintiff has established a protectible property right, the further issue, common to all copyright cases, statutory or common law, is: Was the plaintiff's material copied by the defendant? There will seldom be direct evidence of plagiarism, and necessarily the trier of fact must rely upon circumstantial evidence and the reasonable inferences which may be drawn from it to determine the issue.

▇ An inference of copying may arise when there is proof of access coupled with a showing of similarity. (*Shipman* v. *R.K.O. Radio Pictures, Inc.*, 100 F.2d 533, 538; *O'Rourke* v. *R.K.O. Radio Pictures, Inc.*, 44 F.Supp. 480, 482.) ▇ Where there is strong evidence of access, less proof of similarity may suffice. Conversely, if the evidence of access is uncertain, strong proof of similarity should be shown before the inference of copying may be indulged. ▇ It is particularly important to keep clearly in mind, insofar as the question of similarity is concerned, that it is only similarity as to the plaintiff's pro-

tectible property which is relevant. Thus, if the property interest entitled to protection extends only to certain sequences or characters, similarity of the plaintiff's and the defendant's works as to other phases of the play or scenario is wholly irrelevant.

If it is established that the plaintiff has a protectible property in his literary work and there was copying, the elements of liability for infringement or piracy are established and all that remains is the determination of damages. On this latter issue, the rules are the same with regard to literary property as apply to any other form of personal property. (*Barsha* v. *Metro-Goldwyn-Mayer,* 32 Cal.App.2d 556 [90 P.2d 371]; *Universal Pictures Co.* v. *Harold Lloyd Corp.,* 162 F.2d 354.)

The plaintiffs do not claim that their entire play, or any particular sequence or dialogue, was directly or totally pirated. Their insistence throughout has been that the thing of value in their play is the central dramatic situation and the interplay of the dominant and secondary characters upon each other. All other characterizations and dialogue are admittedly nothing more than hackneyed filler which could be added or subtracted without affecting the value or substance of the plaintiffs' literary property.

Golding testified that when Lewton became reluctant to purchase the play, he told the producer that a moving picture of "The Man and His Shadow" could be based upon very simple lines, and the action need not necessarily take place on a pleasure yacht. The story might well be played in all its dramatic aspects on a freighter, having an ordinary captain and an ordinary crew. There is one important dramatic figure in this play and only one, he said, the captain, with his insane lust for power, driving to carry out his sadistic objectives. And as the production on the Pasadena stage was summarized by the witness, "the sub-story of the other characters seemed very much warped and almost trivial as compared to the figure of the captain who dominated the scene when he appeared."

The first question presented for decision is whether this basic dramatic situation constitutes protectible literary property. On the subject of the use of such plots Faulkner, who formerly had been a story editor at a studio, testified that "the basic duty of [the story editor] is to read a book or . . . play . . . and condense the story theme into two or three pages. This material is then used for conferences with pro-

ducers and executives of the studios so they don't have to read the whole book or play. . . . You have in studios a great problem of budget. . . . That means the studio gives a producer an assignment and says, 'Here is a story, but . . . we don't want you to spend more than this amount of money for the production.' . . . Now in such cases, the story editor goes in and talks over the story with the producer, he says, 'You can do this story. . . , for the lower budget cost because you can eliminate certain incidents, certain persons, certain settings, so that you can create the same basic theme and powerful story. . . .' ''

According to this evidence, the real value of a story or play may have little to do with specific dialogues or sequence of scenes or locale and there is ample evidence tending to prove that the basic dramatic core of the plaintiffs' play constitutes the truly original and valuable feature of it. Further, there was testimony to the effect that this particular psychological drama, with its emphasis upon the captain's controlling monomania for authority and power, was particularly well timed with the early days of the war and, therefore, of unusual value at that time. Nor was it a mere abstract idea. It had been reduced to the form of a full stage play. Its creators had embellished it with much of the trappings that give form, if not substance, to such literary work.

The fact that the plan or theme of the plaintiffs' story is similar to the plots of prior stories does not defeat the claim of originality within the meaning of that word for copyright purposes. ''It is not essential that any production, to be original or new within the meaning of the law of copyright, shall be different from another . . . the true test of originality is whether the production is the result of independent labor or of copying.'' (Drone, Copyrights, cited with approval in *Fred Fisher, Inc.* v. *Dillingham*, 298 F. 145, 151; to same effect, Amdur on Copyrights, § 3, pp. 69, 70.) It is of no consequence that R.K.O. *could have* obtained the story from another source, when there is strong evidence from which the jury has reasonably concluded that the scenario of ''Ghost Ship'' was copied from the plaintiffs' play. ''Any subsequent person is, of course, free to use all works in the public domain as sources for his compositions. No later work, though original, can take that from him. But there is no reason in justice or law why he should not be compelled to resort to the earlier works themselves, or why he should be free to use the composition of

another, who himself has not borrowed. If he claims the rights of the public, let him use them; he picks the brains of the copyright owner as much, whether his original composition be old or new. The defendant's concern lest the public should be shut off from the use of works in the public domain is therefore illusory; no one suggests it.'' (*Fred Fisher, Inc.* v. *Dillingham, supra*, p. 150.) Or, as stated by Justice Holmes: ''Others are free to copy the original. They are not free to copy the copy.'' (*Bleistein* v. *Donaldson Lithographing Co.*, 188 U.S. 239, 249 [23 S.Ct. 298, 47 L.Ed. 460].)

Concerning the issue of copying, and its subsidiary determinations of access and similarity, the evidence as to access is strong. The producers of the motion picture have conceded access, but because the inference of copying must rest upon both access and similarity, it is necessary to examine, to a certain extent, the nature of the evidence of access.

 It appears without conflict that the plaintiffs' play was submitted to Lewton to read and consider. Both Golding and Faulkner testified to conversations with Lewton regarding the acceptability of the story for moving picture purposes. In one of the discussions of it, according to Golding, Lewton stated: ''Well, Golding, I don't have to buy my stories. I don't have to lay out money for originals; I get my idea and I call in a couple of writers on the lot and I make my stories that way.'' It was a few days later that the manuscript was returned to plaintiffs. The evidence of opportunity and, indeed, inclination to pirate plaintiffs' literary property is, therefore, clearly supported by the evidence.

 Proof of access, however, establishes no more than the opportunity to copy and not actual copying. (*Kustoff* v. *Chaplin*, 120 F.2d 551, 560; *Cain* v. *Universal Pictures Co.*, 47 F.Supp. 1013, 1015.) And liability for damages must rest upon substantial evidence of similarity between plaintiffs' literary property and the moving picture produced by the defendants. The play was read to the jury and the picture was viewed by them. There was no other evidence of similarity offered or received, and whether such evidence is sufficient to sustain the jury's implied finding of similarity is a question which can only be determined upon appeal by reading the play and seeing the moving picture, which have been done by this court.

 The parties are directly at variance as to whether this issue of similarity presents a question of law or of fact. The only direct statements in the cases appear to confirm the

playwrights' position that it is a question of fact for the jury. (*Universal Pictures Co.* v. *Harold Lloyd Corp.*, 162 F.2d 354, 360; *Dam* v. *Kirke La Shelle Co.*, 166 F. 589.) However, they extend this point too far when they contend that the determination by the jury of this issue "is conclusive" upon appeal. No finding of fact is binding upon an appellate court if it is not supported by substantial evidence. The function of this court, when the contention of insufficiency is made, is to examine the record to ascertain whether there is evidence to support the verdict of the jury.

The situation presented by the issue of similarity is a peculiar one. There is always *some* evidence in the record. That is to say, if plagiarism is claimed there will always be *a* play by the plaintiff and one assertedly copied from it by the defendant. Yet the mere existence of two dramatic works in evidence does not, *per se*, constitute sufficient evidence of similarity. It is necessary to read or view the two works to see if they present any substantial similarity insofar as the plaintiff's property in his work is concerned. This is not to say that the appellate court will substitute itself for the jury to decide what it thinks of the issue of similarity; it is merely a question of determining if there is any substantial evidence of similarity to support the jury's finding.

In the present case, the movie "Ghost Ship" contains all the elements of the plaintiffs' basic dramatic situation. It is true that the story is placed on a freighter instead of a luxury cruiser, that it showed no passengers but only the crew aboard, and that there are many differences in the minor characters. "Evidence of these differences is relevant upon the question of [similarity] . . . , but if such differences are shown to exist, the question remains for the trier of fact to decide the issue." (*Universal Pictures Co.* v. *Harold Lloyd Corp.*, *supra*; *Maurel* v. *Smith*, 220 F. 195, 199; *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56.) The basic factors of the play and the moving picture show strong similarity in their respective plots although superficially there is considerable difference. But such differences go to the quality of the plagiarism, and not to its existence or nonexistence.

The appellants' main contention, however, is that in making a comparison of the two works, "the standard of the ordinary observer should be applied—that is, the comparison should be made without dissection of the works under observation and without expert or elaborate analysis." (*Harold*

*Lloyd Corp.* v. *Witwer*, 65 F.2d 1, 18; *Frankel* v. *Irwin*, 34 F.2d 142, 144; *Dymow* v. *Bolton*, 11 F.2d 690, 692.) It is, therefore, argued that the court must look at the two plays as a whole to determine if they would impress the average observer as similar. The argument suffers from oversimplification. The rule of law stated is correct insofar as the issue of *similarity* is concerned, but it has no application to the preliminary issue of *originality* or a plaintiff's protectible property interest.

 It is essential from the nature of the inquiry as to originality to first dissect the play to determine wherein, if at all, plaintiffs have any protectible property right. Assuming this is established, then comparison may be made between the two works *as to the original and protectible portion only.* If, as may often be the case, plaintiff's rights extend to the entire play, then the trier of fact should compare the one with the other. Whenever, as in *Stanley* v. *Columbia Broadcasting System, ante,* p. 653 [221 P.2d 73], the plaintiff establishes his ownership of an original combination and arrangement of various elements into a new plan for a radio broadcast, the comparison made by the trier of fact should be of that plan with the broadcast which was made by the defendant. But where, as in the present case, the plaintiffs' property rights extend only to the dramatic core of the play, the issue of similarity is accordingly limited to a comparison on the basis of an average observer looking to that part of the literary work which can properly be protected from infringement. Otherwise stated, dissection may be necessary to define the existence and extent of a plaintiff's property interest, and on the issue of similarity the test is always that of the average observer comparing such property interest with the alleged copy made by the defendant.

 In support of the appellants' contention that there is not sufficient evidence of the value of the damages sustained by the authors of the play, it is argued that all of the evidence concerning the value of the motion picture rights is found in the testimony of the respondents, no person with experience in the determination of the value of such property being called to testify on their behalf. But the testimony of Faulkner, who stated his opinion in regard to the value of the play, was not necessary as an expert for both he and his coauthor testified as owners of the property. Each of them told the jury that the value of the play before the infringement was between $25,000 and $50,000 and that it had

no value after the production and distribution of the picture. It is a well recognized rule that the owner of property is competent to testify as to its worth. (10 Cal.Jur. 1023.) "Literary property is not distinguished from other personal property and is subject to the same rules and is likewise protected. *Palmer* v. *De Witt*, 47 N.Y. 532, 538; 7 Am.Rep. 480. California has held that plaintiffs may testify to the value of an unpublished manuscript prior to misappropriation in *Barsha* v. *Metro-Goldwyn-Mayer*, 32 Cal.App.2d 556, 90 P.2d 371." (*Universal Pictures Co.* v. *Harold Lloyd Corp., supra.*) The testimony of the appellants' experts that the play contained no material of value for motion picture purposes merely created a conflict in the evidence.

The judgment and the order denying the motion for judgment notwithstanding the verdict are affirmed.

Gibson, C. J., Shenk, J., and Carter, J., concurred.

TRAYNOR, J. Dissenting.—The majority opinion in this case, unlike that in *Stanley* v. *Columbia Broadcasting System*, *ante*, p. 653 [221 P.2d 73], recognizes that the question whether there has been copying of plaintiffs' work cannot be submitted to the jury until it has been determined by the trial judge that there is evidence of substantial similarity between plaintiffs' play and defendants' motion picture with respect to the protectible features of plaintiffs' play. With these conflicting decisions before him, may a trial judge on motion for nonsuit or directed verdict determine on the authority of *Golding* v. *R.K.O.* whether there is relevant similarity between the two productions, and only if there is such similarity, deny the motion and submit the case to the jury? Or must he, on the authority of *Stanley* v. *C.B.S.*, deny the motion without consideration of the issue of relevant similarity and let the case go to the jury before determining whether plaintiff established a cause of action upon which the case could properly have gone to the jury?

I cannot agree that a comparison of defendants' picture with plaintiffs' play reveals evidence of similarity not attributable to the use of a common idea, theme, or plot in the public domain and therefore not subject to exclusive appropriation by any author. I would therefore reverse the judgment.

Under Civil Code section 980*, the author of an original composition has a property interest in it that will be protected

against copying to the extent that it is marked by original expression in "a concrete form, in which the circumstances and ideas have been developed, arranged and put into shape." (*Eichel* v. *Marcin*, 241 F. 404, 409; *Holmes* v. *Hurst*, 174 U.S. 82 [19 S.Ct. 606, 43 L.Ed. 904].) That principle governs the determination of a charge of piracy, whether under federal or common law copyright. (*Twentieth Century-Fox Film Corp.* v. *Dieckhaus*, 153 F.2d 893, 894, 897-898; *Echevarria* v. *Warner Bros. Pictures, Inc.*, 12 F.Supp. 632, 634; *Columbia Pictures Corp* v. *Krasna.* 65 N.Y.S.2d 67, 68.)

"Exclusive ownership" is limited to the "representation or expression." (Civ. Code, § 980.) Themes, ideas, and plots in books or plays are a common fund from which every author may draw the basic materials of his work without restriction. They are not subject to exclusive ownership, and no author can acquire a superior interest in a theme or plot by making an earlier use thereof. "The copyright cannot protect the fundamental plot which was common property long before the story was written; it will protect the embellishments with which the author added elements of literary value to the old plot, but it will not operate to prohibit the presentation by someone else of the same old plot without the particular embellishments." (*London* v. *Biograph Co.*, 231 F. 696, 698-699 [145 C.C.A. 582]; *Harold Lloyd Corp.* v. *Witwer*, 65 F.2d 1, 24; *Lewys* v. *O'Neill*, 49 F.2d 603, 607; *Dymow* v. *Bolton*, 11 F.2d 690, 692; *Nichols* v. *Univeral Pictures Corp.*, 45 F.2d 119, 121, 122; *Cain* v. *Universal Pictures Corp.*, 47 F.Supp. 1013, 1016; *Dellar* v. *Samuel Goldwyn, Inc.*, 150 F.2d 612, 613; *Shipman* v. *R.K.O. Radio Pictures Corp.*, 100 F.2d 533, 536; *Fendler* v. *Morosco*, 253 N.Y. 281, 287 [171 N.E. 56]; see Chafee, *Reflections on the Law of Copyright*, 45 Columb.L.Rev. 503, 513-514.) The author's only property interest is in the concrete form that he has developed by his own originality and craftsmanship, the "arrangement and combination of the ideas . . . the form, sequence and manner in which the combination expresses the ideas." (*Bowen* v. *Yankee Network, Inc.*, 46 F.Supp. 62, 64.)

Plaintiffs have developed an unprotectible plot into an orig-

---

*"The author or proprietor of any composition in letters or art has an exclusive ownership in the representation or expression thereof as against all persons except one who originally and independently creates the same or a similar composition."

inal play entitled to protection. The protection extends, however, only to its "details, sequence of events, and manner of expression and treatment." (*Barsha* v. *Metro-Goldwyn-Mayer,* 32 Cal.App.2d 556, 561 [90 P.2d 371].) Even if defendants have taken from the play its plot, they have taken nothing of its expression and development to which alone plaintiffs can claim a superior right.

Plaintiffs rely on a dictum in *Dam* v. *Kirk La Shelle,* 175 F. 902, 907-908 [99 C.C.A. 392, 20 Ann.Cas. 1173, 41 L.R.A. N.S. 1002], that a basic plot may be protected by copyright. What the court there described as a "plot," however, was in fact the concrete form of plaintiff's literary work appropriated almost verbatim by the defendant. Any intimation that a plot apart from its development and expression in a concrete form is protectible should not have survived the decision of *Shipman* v. *R.K.O. Radio Pictures Corp., supra,* 100 F.2d 533, 536-537, 538. (See, also, *Dymow* v. *Bolton,* 11 F.2d 690, 692; *Sheldon* v. *Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 53-54; *Christie* v. *Cohan,* 154 F.2d 827, 828.)

The majority opinion, however, states that "the fact that a plan or theme of the plaintiffs' story is similar to the plots of prior stories does not defeat the claim of originality within the meaning of that word for copyright purposes." The implication is that the plot of the play is protected by copyright if plaintiffs conceived it independently of earlier stories in which it is found. It is settled, however, that the plot of a literary work is not protectible merely because the author has conceived it independently. "We assume that the plaintiff's play is altogether original, even to an extent that in fact it is hard to believe. We assume further that, so far as it has been anticipated by earlier plays of which she knew nothing, that fact is immaterial. Still, as we have already said, her copyright did not cover everything that might be drawn from her play; its content went to some extent into the public domain . . . Whatever may be the difficulties *a priori,* we have no question on which side of the line this case falls. A comedy based on conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible of copyright than the outline of Romeo and Juliet." (*Nichols* v. *Universal Pictures Corp.,* 45 F.2d 119, 122; *Sheldon* v. *Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 54; *De Acosta* v. *Brown,* 146 F.2d 408, 410; *Echevarria* v. *Warner Bros. Pictures, Inc.,* 12 F. Supp. 632, 635; *Fendler* v. *Morosco,* 253 N.Y. 281, 287 [171

N.E. 56]; *MacDonald* v. *Du Maurier,* 75 F.Supp. 655, 660; *McConnor* v. *Kaufman,* 49 F.Supp. 738, 744; *Becker* v. *Loew's, Inc.,* 133 F.2d 889, 892, cert. den. 319 U.S. 772 [63 S.Ct. 1438, 87 L.Ed. 1720]; *Heywood* v. *Jericho Co.,* 193 Misc. 905 [85 N.Y.S.2d 464, 468].)

The majority opinion seeks to support the converse proposition by the cases of *Bleistein* v. *Donaldson Lithographing Co.,* 188 U.S. 239 [23 S.Ct. 298, 47 L.Ed. 460], and *Fred Fisher, Inc.* v. *Dillingham,* 298 F. 145. Those decisions, however, support the rule of the Nichols and Sheldon cases and do not enunciate a rule contrary thereto. In *Bleistein* v. *Donaldson, supra,* infringement resulted from the defendants' identical reproduction in reduced size of plaintiff's lithographs of circus scenes. Copying was admitted. As a defense it was alleged that plaintiff's lithographs were picturizations of actual scenes and living persons and he was not entitled to copyright thereof. The court held that the fact that the subject of the production was in the public domain did not excuse the theft of the concrete form in which plaintiff's original development of the subject was expressed. ''It is obvious also that the plaintiff's case is not affected by the fact, if it be one, that the pictures represent actual groups—visible things . . . that fact would not deprive them of protection. The opposite proposition would mean that a portrait by Velasquez or Whistler was common property because others might try their hand on the same face. Others are free to copy the original. They are not free to copy the copy.'' (188 U.S. 239, 249.) It is clear that Justice Holmes regarded as protectible only plaintiff's originality of expression.\* His holding that defendants were not free to copy the original expression and development of a nonprotectible theme or subject cannot be distorted to mean that others are precluded from giving the same theme a different form. One does not ''copy the copy'' merely by using the same subject or theme. The ''whole contribution may not be protected; for the defendants were entitled to use, not only all that had gone before, but even the plaintiffs' contribution itself, if they drew from it only the more general patterns; that is, if they kept clear of its 'expression.' '' (*Sheldon* v. *Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 54.)

---

\*The same explanation applies to Judge Learned Hand's decision in the Fred Fisher case, holding that defendant's identical duplication of plaintiff's original variation of a musical theme constituted copyright infringement. (298 F. at 150; see also his concurring opinion in *Shipman* v. *R.K.O. supra.*)

Since "the degree of protection afforded by the copyright is measured by what is actually copyrightable in it; that is, by degree and nature of the original work" (*American Code Co.* v. *Bensinger,* 282 F. 829, 834; *Dorsey* v. *Old Surety Life Ins. Co.,* 98 F.2d 872, 873), similarity between the play and the picture not attributable to the copyrightable features of the play is irrevelant. (*Harold Lloyd Corp.* v. *Witwer,* 65 F.2d 1, 17; *Nichols* v. *Universal Pictures Corp.,* 45 F.2d 119, 121; *Cain* v. *Universal Pictures Corp.,* 47 F.Supp. 1013, 1017; *Affiliated Enterprises* v. *Gruber,* 86 F.2d 958, 961; *De Montijo* v. *Twentieth Century-Fox Film Corp.,* 40 F.Supp. 133, 138; *Shipman* v. *R.K.O. Radio Pictures, Inc.,* 100 F.2d 533, 537; *Rush* v. *Oursler,* 39 F.2d 468, 473; *Rosen* v. *Loew's, Inc.,* 162 F.2d 785, 788; *Eichel* v. *Marcin,* 241 F. 404, 409; *MacDonald* v. *Du Maurier,* 75 F.Supp. 655, 662; *Hewitt* v. *Coward,* 41 N.Y.S.2d 498, 500; *Columbia Pictures Corp* v. *Krasna,* 65 N.Y.S.2d 67, 69; *Heywood* v. *Jericho Co.,* 193 Misc. 905 [85 N.Y.S.2d 464, 468]; see dissenting opinion in *Stanley* v. *C.B.S., ante,* p. 653 [221 P.2d 73].) General similarity between two productions attributable to their use of a common plot drawn from the public domain, or similarity in incident attributable to the use of common sources of material, is not evidence of literary piracy. Unless "the two works, when compared, show such pronounced similarities of substantial portions of protectible material, i. e., of details, sequence of events, and manner of expression and treatment, as to warrant the inference of copying," it is error to submit the issue of copying to the jury. (*Barsha* v. *Metro-Goldwyn-Mayer,* 32 Cal.App.2d 556, 561 [90 P.2d 371].)

Upon this principle, the federal and New York courts have consistently reversed judgments for plaintiffs or granted motions for dismissal or for judgment on the pleadings for defendants when the only similarity between the two productions has been that attributable to the use of a common plot. In *Harold Lloyd Corp.* v. *Witwer,* 65 F.2d 1, the Ninth Circuit Court of Appeals reversed a judgment for plaintiff based on the trial court's finding that defendant's motion picture had been copied from plaintiff's magazine story. Both works were based on the same plot: A university freshman of little physical ability, attempting to impress a coed with his athletic prowess becomes involved in a number of ludicrous situations that subject him to the ridicule of the student body. Through

a series of improbable events, he involuntarily becomes a game-winning football hero and wins the love of the girl and the plaudits of his classmates. These similarities were held to be irrelevant, attributable only to the "use of common materials, and common sources of knowledge, open to all men." The court declared that "the resemblances are either accidental or arising from the nature of the subject" (65 F.2d at 17) and held that the "*reproduction* of such *non-original matter*," even though a conscious borrowing, is not actionable copying. (65 F.2d at 24.)

In *Ornstein* v. *Paramount Productions, Inc.*, 9 F.Supp. 896, plaintiff's story and defendant's motion picture were both based on a married woman's sacrifice of her honor to pay for her husband's medical care. In each story, the husband accepted the aid in ignorance of its source, and upon discovery indignantly repudiated his wife. Both story and picture described the wife's struggle against adversity until her reconciliation with her husband in the picture and her death in the story. The court dismissed plaintiff's bill for failure to state a cause of action, holding that the acknowledged similarities lay only in a common plot in the public domain. Substantial dissimilarities in treatment and development between the two productions were held as a matter of law to preclude a finding of copying. The same result was reached in the following cases: *Heywood* v. *Jericho Co.*, 193 Misc. 905 [85 N.Y.S.2d 464] (both plays dealt with the return of a Negro war hero to his native southern community, his love for a white girl, and their struggle against the bigotry, violence, and hatred of the white community) ; *Collins* v. *Metro-Goldwyn Pictures Corp.*, 25 F.Supp. 781, 782 (both stories portrayed the life of a test pilot) ; *London* v. *Biograph Co.*, 231 F. 696 [145 C.C.A. 582] (both stories dealt with the successful attempts of two thieves to poison each other to avoid a division of their spoils) ; *Fendler* v. *Morosco*, 253 N.Y. 281 [171 N.E. 56] (both plays were based on the love of a white youth for an Hawaiian girl) ; *MacDonald* v. *Du Maurier*, 75 F.Supp. 655 (the book "Rebecca" was alleged to have infringed a story by plaintiff concerned also with the conflict between a second wife and the spirit and memory of the first) ; *McConnor* v. *Kaufman*, 49 F.Supp. 738 (both plays dramatized the late Alexander Woolcott's eccentricities and interest in unsolved murders) ; *Columbia Pictures Corp.* v. *Krasna*, 65 N.Y.S.2d 67 (both stories involved the writing of letters to a soldier overseas by an adolescent girl posing as her own older sister) ; and *Cain* v. *Universal Pictures*

*Corp.*, 47 F.Supp. 1013 (alleged infringement was based on the common use of a sequence in which a storm forces the hero and heroine to take overnight refuge in a church loft; see, also, *Dymow* v. *Bolton*, 11 F.2d 690, 692; *Kustoff* v. *Chaplin*, 120 F.2d 551, 561; *Lewys* v. *O'Neill*, 49 F.2d 603, 607; *Dellar* v. *Samuel Goldwyn, Inc.*, 40 F.Supp. 534, 536; *Rush* v. *Oursler*, 39 F.2d 468, 472-473; *Rosen* v. *Loew's, Inc.*, 162 F.2d 785, 788; *Eichel* v. *Marcin*, 241 F. 404, 408-409; *Lowenfels* v. *Nathan*, 2 F.Supp. 73, 80; *Gropper* v. *Warner Bros. Pictures, Inc.*, 38 F.Supp. 329, 332; *Affiliated Enterprises* v. *Gruber*, 86 F.2d 958, 961; *Caruthers* v. *R.K.O. Radio Pictures, Inc.*, 20 F.Supp. 906, 907; *Christie* v. *Harris*, 47 F.Supp. 39, 42, aff'd. *sub. nom.*, *Christie* v. *Cohan*, 154 F.2d 827.)

If, however, the finding of copying is supported by evidence of similarity between two works with respect to the expression and development of their common plot in a concrete form and sequence of events marked by the first author's craftsmanship and creative talent, a judgment for plaintiff based thereon will be affirmed, as in *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 81 F.2d 49. In that case, plaintiff's play was based on the 1857 trial in Scotland of a young woman named Madeleine Smith, on the charge that she murdered a discarded lover to prevent his revelation of their former intimacy to her present fiancé. "This was the story which the plaintiffs used to build their play. As will appear they took from it but the merest skeleton, the acquittal of a wanton young woman, who to extricate herself from an amour that stood in the way of a respectable marriage, poisoned her lover. The incidents, the characters, the *mis en scène*, the sequence of events, were all changed; nobody disputes that the plaintiffs were entitled to their copyright. All that they took from the story they might probably have taken had it even been copyrighted." (81 F.2d at 50.) From this "merest skeleton" plaintiffs developed an original story of sensuality and murder suggested by the events upon which it was based. Defendant's motion picture presented not just a similar story based on the same facts (which would have been permissible even if it were suggested by plaintiff's play), but substantially the same details, sequence of events, manner of expression and development, and often the same dialogue, that gave plaintiffs' play its character of originality and concreteness of form. The Second Circuit Court of Appeals reversed a decree of dismissal, stating that although plaintiffs could not preclude any subsequent

use of the same source of material or story outline or the deliberate borrowing of their plot, they were entitled to protection against piracy of their original contribution to that plot in a concrete form. Since similarity between the two works was manifested by a parallelism of incident and detail originally developed by plaintiffs, an inference of copying was held to be reasonable. In *De Acosta* v. *Brown*, 146 F.2d 408, 410, both works were based on the life of Clara Barton, but there was similarity between them in the names of seven principal characters (of the six fictional names one accidentally misspelled name in plaintiff's story was identically reproduced in defendant's), in a fictional romance between Miss Barton and a young gold prospector even as to the details of its genesis and termination, and in the complete sequential development of the story outline. The Second Circuit Court of Appeals affirming a judgment for the plaintiff, emphasized that the finding of infringement was supported by evidence of similarity in expression and development and not by similarity in the plot of the two stories or in their use of historical material. (See, also, *Barsha* v. *Metro-Goldwyn-Mayer*, 32 Cal. App.2d 556, 561 [90 P.2d 371], and *Universal Pictures Co., Inc.* v. *Harold Lloyd Corp.*, 162 F.2d 354, 360, in which judgments for the plaintiffs were held supported by evidence of the use of identical comedy sequences originally developed by the plaintiffs, not by similarities resulting from the use of the same plot.)

Admittedly, both play and picture in the present case utilize the same basic plot, the story of a paranoiac ship's captain obsessed by his position and authority, engaged by an opponent aboard his ship, and defeated by that opponent and by his own mental collapse. If a plot apart from its expression in a concrete form were protectible, the first use of this plot would have withdrawn from all subsequent use a most fertile field for the production of stories of the sea. The captain and his opponent have long been stock sea story material. They were present in the persons of Captain Bligh and Fletcher Christian of "Mutiny on the Bounty," of Wolf Larsen and Humphrey van Weyden of "The Sea Wolf," and in the principals of numerous other stories of ships and the men who man them. It is immaterial, however, whether the plot common to play and picture is old or new; the only protection plaintiffs can claim under copyright law is limited to its expression and development in a concrete form. In the present case there is no substantial evidence of similarity between the

play and picture with respect to the features protected by copyright. ''When one attempts comparison of the two works, in those matters as to which copyright protects—that is, the spirit or soul infusing the creatures of the author's imagination, what they desire, and how they go about achievement, the reasons for their actions, and the words in which such reasons are expressed—I can see nothing but differences.'' (*Frankel* v. *Irwin*, 34 F.2d 142, 144; *MacDonald* v. *Du Maurier*, 75 F.Supp. 655, 662.)

Plaintiffs' captain (Crawley) is an impostor, an actor who knows nothing of seamanship, who has killed the real captain to get aboard the boat and bring about the death of an enemy (Brancato) he believes has ruthlessly stifled the acting ability that he (Crawley) may now display. He exults in the power he possesses, but only because he holds it by virtue of his ability to act the part of the captain. He is obsessed by his art, not by his authority. He challenges Brancato to expose him, to demonstrate that by his consummate acting he can make others believe only what he wants them to believe. He kills only because murder is necessary to the maintenance of his pretense. He hates Brancato and attempts to drive him to suicide. When he believes he has accomplished his purpose, he takes his own life in fear and remorse. The form and development of this story, the embellishment of incident and detail, give the play the stamp of plaintiffs' originality and entitle it to protection, but only against piracy of the protectible features.

Defendants, however, have taken from plaintiffs' play, if anything, only that which is common property. In order to use an old ship set not then in use, they used a story outline a great deal older and more timeworn. They added to it nothing not already in the public domain; certainly they added to it no ingredient for which plaintiffs can claim protection. Their story was built on a tyrannical captain, his abuse of authority, and his eventual defeat. Their captain (Stone) is a veteran of the sea, competent and experienced. Pride in his authority has become an obsession, driving him insane. He kills only to prove his authority. He does not hate his opponent, Merriam, whose only common denominator with plaintiffs' Brancato is his opposition to an insane captain. He does not commit suicide, but is killed to prevent the murder of Merriam. ''This incomplete skeleton the two plays have in common, but it is with real difficulty that the flesh and blood, the incidental, yet essential, adornment and trimming, of the plays can be

cut away to show similarity between a few bones." (*Dymow v. Bolton,* 11 F.2d 690, 692.) Here, as in *Stanley* v. *C.B.S., ante,* p. 653 [221 P.2d 73], defendant's motions for nonsuit, directed verdict, and judgment notwithstanding the verdict raised the question whether there was substantial evidence of relevant similarity to justify the submission of the case to the jury for a determination whether that similarity was the result of copying. In denying the motions, the trial court erroneously determined that there was substantial evidence of relevant similarity. In reversing the judgment, this court would not be substituting its judgment for that of the jury on a question of fact, but would determine merely that there was insufficient evidence to support a finding of copying. (*Nichols* v. *Universal Pictures Corp.,* 45 F.2d 119, 121, 122; *Hewitt* v. *Coward,* 41 N.Y.S.2d 498, 500; *Dorsey* v. *Old Surety Life Ins. Co.,* 98 F.2d 872, 874; *Soy Food Mills, Inc.* v. *Pillsbury Mills, Inc.,* 161 F.2d 22, 25.) I would therefore reverse the judgment.

Spence, J., concurred.

SCHAUER, J.—I dissent.

Certainly there was no necessity for the defendants to read plaintiffs' "The Man and His Shadow" in order to obtain the "basic plot," or its subordinates, as depicted in "The Ghost Ship"; they needed only to turn to "The Universal Plot Catalog" (Henry Albert Phillips) or to "Story Plotting Simplified" (Eric Heath). In the last named work (which admittedly only suggests further subclassifications or applications of the fundamental law[1] proclaimed by Georges Polti[2]) we find in chapter XIX (subsituation 15 of the sixteenth situation) the following listing:

| "Madman | Victim | The Cause" |
| "A sea-captain | His crew | Insanity" |

And in chapter XXVII we find:

| "Superior Rival | Inferior Rival | The Object" |
| "A sea-captain | His first mate | A native girl" |

---

[1] "There are only thirty-six fundamental dramatic situations, various facets of which form the basis of all human drama." ("The Thirty-Six Dramatic Situations," by Georges Polti, 1916.)

[2] Recognition of the "law" antedates Polti; Goethe relates that "Gozzi maintained that there can be but thirty-six tragic [dramatic] situations. Schiller took great pains to find more, but he was unable to find even so many as Gozzi."

These situations, it seems to me, are too well and widely known and have been too often written about, to admit of present proprietorship in them merely as such. *They might be used in something original but they are not original.* Yet it is only in relationship to these situations that any similarity between play and picture can be found. They fit ''The Ghost Ship'' almost precisely; indubitably they constitute the so-called ''basic plot'' or ''central core'' of the pictured story; they fit it far more closely than does any situation portrayed in plaintiffs' sketch; and they were free to defendants' use.

Plaintiffs' sketch, likewise, uses formulae plot and subordinates. It avails of a mad sea-captain, a passenger instead of a crewman, and, as the cause, descends to jealousy—mad jealousy. Jealousy, in the Thirty-Second Situation of Polti, is labeled ''Mistaken Jealousy.'' ''The reason,'' says Heath, ''is that jealousy in itself is not dramatic.'' Even ''Mistaken Jealousy'' has poor emotional value and ''the usual solution [which plaintiffs have adopted] . . . —a murder, *suicide,* divorce, or separation—is extremely hackneyed and undramatic.'' (Italics added.) Plaintiffs' use of the equally hackneyed ''pursuit-escape'' technique and ''A hurricane A vessel Seamanship'' may be found clearly depicted and specifically listed in Heath's exposition of Polti's law. (Fifth Situation, chap. VIII.)

Regardless of whether similarity or protectibility should be first determined it seems obvious in this case that plaintiff cannot recover. The majority opinion admits that ''the basic dramatic core of the plaintiffs' play constitutes the truly original and valuable feature of it . . . [That,] in the present case, the plaintiffs' property rights extend only to the dramatic core . . .'' It might as well be claimed on behalf of plaintiffs that they possess a common law copyright to the origination and use of some certain word already in common usage. To see if the claim to originality and proprietorship in such combination of letters could possibly be tenable we should first turn to a dictionary and if we found that combination as a recognized word in the ''public domain'' of the English language we should go no further in listening to plaintiffs' claim. Here we need only turn to the dramaturgic equivalent of a dictionary—a catalog of plots in the public domain of literature—to find the ''central core''—the admittedly sole basis of plaintiffs' claim of a protectible element.

So far as I know, no copyrights or other forms of literary

protection have heretofore been granted as to the literary use of madmen, sea-captains or murders, as such. I find nothing of literary novelty in the portrayal, by either plaintiffs or defendants, of dominant and secondary characters; nor in the concept that a ship's captain has supreme authority over his command on the high seas and may demonstrate a mad lust for or brutal exercise of power; nor in the proposition that a paranoiac may captain a ship or be a killer; nor in the manner in which the above elements, or any of them, have been put together by either plaintiffs or defendants. In any event the similarity, if any, between the story by plaintiffs and the picture by defendants lies exclusively in the plots which are in the public domain, not in the treatment thereof which originality could make protectible.

As I view the film, if it possesses any quality at all which may be said to give it character, originality or any element of literary protectibility, that quality would seem to be a combination of details in production, an imprint of the artistries of director and actor. But, insofar as plot or, as the majority denominate it, "central core," is concerned, I am satisfied that neither the story told by plaintiffs nor that ·pictured in the film, can be said to possess *in this decade* any element of originality qualifying it to be the subject of exclusive literary property rights and protectibility. In some aspects each plot is at least as old as Shakespeare[3] and, since Polti, the whole substance of each has been but a published formula. And if either work does possess originality in substance, structure or form sufficient to make it protectible as literary property, then, measured by an equal standard, it surely follows that the film is so different from plaintiffs' story as to preclude plaintiffs' recovery for plagiarism.

The Ghost Ship sailed but I think neither it nor its author was engaged in piracy; and I think upholding the judgment in this case supports a result which approaches closer to piracy than did any act of the defendants. Certainly the individual writer should have ample protection for his literary enterprise but zeal to protect him should not lead to strait-jacketing producers against what appears here to have been but a legitimate exercise of their own freedom of enterprise in an open field.

---

[3] See MacBeth, Hamlet, Othello, King Lear; see also the works listed by Polti under examples of the Twenty-Fourth Situation, subclassification A (9).

For the reasons stated I would reverse both the judgment and the order denying the motion for judgment notwithstanding the verdict.

Appellants' petition for a rehearing was denied August 31, 1950. Traynor, J., Schauer, J., and Spence, J., voted for a rehearing.