### MAUREL v. SMITH et al.

(District Court, S. D. New York. February 2, 1915.)

**1. LITERARY PROPERTY ☞7—OWNERSHIP—JOINT AUTHORSHIP.**

Where it was agreed between plaintiff and defendant that defendant would write a comic opera, for which plaintiff wrote the scenario, and, though defendant made many changes in the plot, he used the scenario, and adopted the whole framework and scheme thereof, they were joint authors, with the rights and obligations implied by law from such relation.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 6; Dec. Dig. ☞7.]

**2. LITERARY PROPERTY ☞7—OWNERSHIP—JOINT AUTHORSHIP.**

Where plaintiff and defendant H. agreed that such defendant should write a comic opera, for which plaintiff wrote the scenario, and H. engaged defendant R. to write the lyrics, the lyrics, when united with dialogue, plot, and music into one composition, became such a part thereof that plaintiff had an interest therein, though they had slight or no relation to the plot, and though R. in several instances simply took old songs, which he had already written, and placed them in the libretto, and the subsequent publication of such songs separate from the opera did not break the original unity or defeat plaintiff's rights.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 6; Dec. Dig. ☞7.]

**3. COPYRIGHTS ☞41—OWNERSHIP—CONSTRUCTIVE TRUSTEES.**

Where two of three joint authors of a comic opera took out copyrights thereon, they became constructive trustees for the third author, and were accountable to her for her interest in the literary property destroyed by the publication and copyright.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 40, 48; Dec. Dig. ☞41.]

**4. LITERARY PROPERTY ☞7—CONTRACTS—NOTICE.**

Plaintiff contracted with W. and L. to write a scenario for a comic opera, the dialogue and lyrics to be written by B., who failed to take up the work. W. and L. asked one of the defendants to undertake the completion of the opera, telling him that plaintiff was to write the scenario and that her assent was necessary, and he procured the scenario from her, and in conjunction with the other defendant completed the libretto. A contract was made between defendants and W. and L., reciting that W. and L. had the exclusive dramatic rights in plaintiff's scenario, that defendants were to write the opera, and W. and L. to produce it, and pay certain royalties, and hold defendants harmless against any suits arising over the scenario. *Held*, that defendants were charged with notice of plaintiff's rights, and with complete knowledge of the contents of the contract between her and W. and L., and any inference by them as to the extent of her conveyance to W. and L. was at their own peril.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 6; Dec. Dig. ☞7.]

5. TRUSTS ⚖➙359—ESTABLISHMENT—EQUITY JURISDICTION.

Equity had jurisdiction of a suit by one of the joint authors of a comic opera against the others, who had taken out copyrights thereon, to have them adjudged constructive trustees for plaintiff, and for an accounting, even though there were no complicated accounts requiring equitable relief, as plaintiff's rights arose from a constructive trust, created and cognizable only by a court of equity.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 554, 565, 566; Dec. Dig. ⚖➙359.]

6. COPYRIGHTS ⚖➙41—OWNERSHIP—RIGHTS OF JOINT AUTHORS.

Where two of the joint authors of a comic opera had it published and copyrighted, even though the third author did not consent thereto, and though the absence of her consent avoided publication, she might accept the wrongful publication and insist upon her proprietary rights, as though she had consented at the outset.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 40, 48; Dec. Dig. ⚖➙41.]

7. EQUITY ⚖➙39—RETENTION OF JURISDICTION TO GRANT COMPLETE RELIEF.

In a suit by one of the joint authors of a comic opera to have the other authors, who took out a copyright on the opera as a dramatic composition, adjudged constructive trustees for plaintiff, equity, having taken jurisdiction for this purpose, would also determine plaintiff's rights in any other literary or dramatic property not copyrighted, including the moving picture rights and dramatic rights for stock companies, though it was doubtful whether a bill in equity would lie for a determination thereof alone.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 104–114; Dec. Dig. ⚖➙39.]

8. COURTS ⚖➙329—UNITED STATES COURTS—JURISDICTION—AMOUNT IN CONTROVERSY.

The allegations of plaintiff's bill as to the value of the subject-matter in controversy will serve to give jurisdiction to the United States District Court, unless it clearly appears that the effort to give jurisdiction was only colorable and that the amount is less than $3,000.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 897; Dec. Dig. ⚖➙329.]

9. LITERARY PROPERTY ⚖➙7—ROYALTIES—DIVISION BETWEEN JOINT AUTHORS.

Plaintiff agreed with defendant H. that defendant should write the libretto for a comic opera, for which plaintiff wrote the scenario. H. engaged R. to write the lyrics, and defendants completed the libretto, gave an exclusive license to print the vocal scores and lyrics, and took out a copyright on the libretto as a dramatic composition. The composer of the music was, by agreement with defendants, to have one-half of the royalties, and plaintiff did not complain of this arrangement. *Held*, that a division of the remaining one-half of the royalties equally between plaintiff and the two defendants would not prejudice defendants, and could not be complained of by them.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 6; Dec. Dig. ⚖➙7.]

In Equity. Suit by Fred De Gresac Maurel against Harry B. Smith and others. Decree in favor of plaintiff.

This is a bill in equity, brought by the author of the scenario of a comic opera produced in New York under the title of "Sweethearts." It alleges that the plaintiff and the defendant Harry B. Smith entered into an agreement by which the plaintiff was to give a scenario and Smith was to write upon it a libretto for the comic opera; that Smith should copyright the same with the plaintiff as co-owner; that as to the songs, or "lyrics," Smith should have two-thirds of the royalties of English versions and one-third of translations;

that later Harry B. Smith procured another defendant, Robert B. Smith, to write the lyrics, to which change the plaintiff subsequently consented; that Robert B. Smith in his undertaking had full knowledge of the plaintiff's rights and wrote the lyrics for the piece; that later, without plaintiff's knowledge, Robert B. Smith made an agreement with the other defendant, G. Schirmer, Incorporated, to give it the right to publish the play and to copyright it, and took from the corporation an agreement to pay royalties to the two Smiths, which agreement they procured by falsely representing themselves to be the sole owners; that in pursuance thereof G. Schirmer, Incorporated, published the opera as a whole and certain vocal numbers separately, and took out statutory copyrights upon each; that the defendant Harry B. Smith also took out a statutory copyright in his own name upon the complete libretto. The relief prayed is that the plaintiff be adjudged the joint owner with the defendant Harry B. Smith in the opera and statutory copyrights in both it and the lyrics, and entitled to a share in the future royalties arising from the publication, that the corporation be adjudged trustee of such copyright in the comic opera, that Robert B. Smith be adjudged to have no right in the same, and that the plaintiff have an account of past profits. There is other matter in the bill, which for the purposes of this suit may be disregarded.

Upon the hearing the following facts developed: In September, 1912, the plaintiff made a contract with a firm of theatrical managers in New York, Werba & Luescher, by which she undertook before October 2d of that year to write a full and complete scenario for a proposed comic opera, and in which she accepted one Henry Blossom as collaborator to write the dialogue and "lyrics." She granted to the managers the exclusive right to produce the opera publicly in the United States and Canada for the ensuing season and the season of 1914–15, in return for which the managers agreed to pay her certain royalties on all the gross receipts, which are not here material. The managers likewise agreed to advertise the plaintiff as the author, and not to make any changes in the opera without her consent. The publishing rights the plaintiff expressly reserved, and the managers also agreed not to sublet the right to produce the opera. The plaintiff did not complete the scenario at the time agreed, and during November Blossom declined to take up the work, thus leaving the managers with the first act of a belated scenario on their hands and no one to complete the play. Being in a serious predicament because of their other engagements looking toward its production, early in December they asked the defendant Harry B. Smith, a well-known writer of librettos for such productions, to undertake the completion of the play within such time as would permit its presentation. In their interview with Smith the managers told him that the plaintiff was to write the scenario under agreement with them and that her assent was necessary. Smith spoke to her on the telephone, and she agreed that he should write the play in the place of Blossom, upon which the managers delivered to him the first act of the scenario, which alone at that time had been completed. On that day or the next Harry B. Smith had an interview with the plaintiff, the exact character of which is in dispute. It is agreed, however, that the plaintiff promised to complete the second act of the scenario and send it to him, and he agreed to undertake to write a play upon it, if he should be satisfied. The music was to be composed later. The plaintiff says that at that time Smith agreed that they should collaborate in producing the libretto upon the same terms as had theretofore existed between them, they having collaborated in several instances in the past, but Harry B. Smith says that no such agreement was made. He began at once to work upon the play, having in his possession the first act of the scenario, and within the week the plaintiff sent to him the second act, which he retained. Harry B. Smith soon discovered that he could not write the whole play, and he therefore engaged his brother, Robert B. Smith, to write the "lyrics"; the latter having full knowledge that the plaintiff was the composer of the scenario. Together they completed the libretto.

On the 10th of December, 1912, the managers entered into a contract with the Smiths, reciting that they had the exclusive dramatic rights in the plaintiff's scenario, and that they wished the Smiths to make the libretto, in consideration of which the Smiths agreed to write the play by the 15th of Jan-

uary, and the managers agreed to produce it by the 15th of February. The names of the plaintiff and both Smiths were to appear on all programmes along with the composer, and the Smiths were to have the right of publication, along with certain royalties based upon the managers' gross receipts. The managers also agreed to hold the Smiths harmless against any suits arising over the scenario furnished by the plaintiff, to which the managers at that time claimed exclusive rights. On the 23d of December Robert B. Smith made a contract with G. Schirmer, Incorporated, by which he gave it the exclusive license to print the "lyrics" and vocal score of the opera, or any part thereof, and the corporation agreed to publish and copyright it, and to pay certain royalties to Smith, in pursuance of which G. Schirmer, Incorporated, took out a copyright upon the whole opera, libretto and music, and upon several songs, lifted from the opera, the words of all of which were necessarily the work of only Robert B. Smith. On April 18th Harry B. Smith obtained a copyright in his own name for the complete libretto of the opera as a dramatic composition.

In writing the libretto, neither of the Smiths had any assistance from the plaintiff, other than the scenario. She had no interview with Robert B. Smith, nor any with Harry B. Smith after that of December 2d. She gave no help in composing the dialogue, nor did she attend any rehearsals till just before the production. They testify that they made small use of her scenario, especially that of the second act, and Robert B. Smith particularly asserts that in the composition of the lyrics he made no use whatever of the scenario, and that, indeed, in several instances he simply took old songs, which he had already written, and placed them in the libretto. In all cases Harry B. Smith so arranged the dialogue as to make a more or less easy transition into the song. The opera proved a success, and Robert B. Smith has received from G. Schirmer, Incorporated, royalties amounting to more than $5,500 under his contract of December 23, 1912. On October 3, 1913, the composer, the plaintiff, and the two Smiths entered into a contract with an Australian manager, by which they agreed to give him the dramatic rights in Australia, New Zealand, and South Africa for a certain percentage of the royalties, of which the composer was to get one-half, the plaintiff one-fourth, and the Smiths jointly the remaining one-fourth. At that time $1,500 was paid down and divided between the several authors.

Nathan Burkan, of New York City, for plaintiff.
Maxwell C. Katz, of New York City, for defendants.

LEARNED HAND, District Judge (after stating the facts as above). [1] I do not propose to decide whether in the interview of December 2, 1912, Harry B. Smith and the plaintiff agreed that his work should be upon the terms of their previous contracts. There had been a number of these, all drafted in detail, and the bill is undoubtedly drawn upon the theory that that interview constituted a contract between the parties; but it is not necessary that the plaintiff should recover the express division of royalties there alleged, if enough facts are shown independently to give her the relief which she now asks. However, I do find that they agreed at that time that Harry B. Smith was to take the scenario and work upon it, if he approved it, that they agreed to a joint authorship in the piece, and that they accepted whatever the law implied as to the rights and obligations which arise from such an undertaking. I further find that Robert B. Smith had knowledge of the plaintiff's scenario and contributed his work upon the understanding that all three were contributing to a single joint operatic performance and assented to the work on those terms. The effect of the Smiths' misunderstanding of the plaintiff's rights, arising from Werba & Luescher, I shall consider later.

The case may therefore be considered upon the basis of what rights the law will imply from an agreement of the kind mentioned. I have been able to find strangely little law regarding the rights of joint authors of books or dramatic compositions. The only case in the books in which the matter seems to have been discussed is Levy v. Rutly, L. R. 6 C. P. 523. That was a case in which Levy had employed Wilks to write a play for him, which Wilks did, and the plaintiff, finding some of the incidents were objected to by members of the playing company, made various alterations and additions; one scene being entirely new. The drama thus altered the plaintiff produced, and took from Wilks a receipt for a certain sum down "for my share, title, and interest as co-author with him in the drama." Wilks died, the defendant pirated the drama, and Levy sued. It was held that he could not recover, as his work did not constitute him a joint author, and the judges discussed the question of joint authorship, and each concluded that it would arise only when several parties contributed their labor to the production by common and preconcerted design. Keating, J., at page 529, used the following language, which has often been quoted:

"If two persons undertake jointly to write a play, agreeing on the general outline and design and sharing the labor of working it out, each would be contributing to the whole production, and they might be said to be joint authors of it; but to constitute joint authorship there must be a common design."

Montague Smith, J., at page 530, says:

"But I take it that, if two persons agree to write a piece, there being an original joint design and the co-operation of the two in carrying out that joint design, there can be no difficulty in saying they are joint authors of the work, though one may do a larger share than the other."

I cannot doubt that the production of this opera was the result of such a joint design. It is quite clear that the plaintiff in the first place intended to collaborate with Blossom, and Harry B. Smith certainly understood that he was to use the scenario of the plaintiff in substitution for Blossom. This appears abundantly by the provisions in the Smiths' contract with the managers, in the copyright notices, and in the contract of October 3, 1912. That Harry B. Smith used the scenario in preparing the libretto is in my judgment proved beyond doubt by a comparison between the completed libretto and the scenario itself. He made many changes in the plot, but no one can read the two without seeing that the whole framework and scheme had been adopted from the scenario itself. The defendants have with much elaboration insisted upon these changes, but they in no sense modify the fundamental fact that the idea of the plot originated with the plaintiff. I do not think it necessary to go into the details of this comparison, for the records remain for any one to read. It is enough to say that by changes, omissions, additions, and alterations a subsequent author cannot avoid the debt which he owes to the maker of the plot, or treat him merely as the suggester of the piece, under Shepherd v. Conquest, 17 C. B. 427. A scenario followed as much as this goes into the bone and flesh of the production.

[2] As to Robert B. Smith the case is different, in that it cannot be

said that he used the scenario to anything like the same extent. The titles of the "lyrics" suggested by the plaintiff apparently he did not use, unless it be the Angelus and the opening chorus. That, however, makes no difference in my judgment, for the "lyrics," whether composed, or even, in one or two instances, actually lifted from other context, nevertheless became a part of the whole opera when completed. It is true enough that the appositeness of the "lyrics" to the context is slight, as is common enough in such productions. They form no part of the dramatic action, and are merely pleasing diversions from whatever fragment of plot runs through the whole. Yet no one can hope to measure the degree of contribution which the plaintiff made to their production or selection, and no one ought to try. Moreover, it is not necessary to hold that the "lyrics" have any relation whatever to the plot, or owe any suggestion to it in the mind of their composer, because they became united with dialogue and plot and music into one composition, and whatever their origin, in their presentation the whole was single. Their subsequent separate publication did not break this original unity, because it is impossible to say how much of their vogue was due to them alone, and how much to their presentation along with the opera as a whole. A moment's reflection will, I think, make this clear. Some one goes to such an opera, and brings away a general pleased impression, which he seeks to repeat. Some of the individual numbers may have struck him as tuneful, or comic, or touching; and so he buys a song or more to play or sing. When he does so, no one can tell how much the song alone contributes, or how much it may be blended with the general impression of the piece. It is enough that the song originally appeared in the context of plot, dialogue, and music, and got its currency along with the whole production. We should have no difficulty whatever in reaching such a conclusion, were the production higher in the dramatic art—e. g., any of the more ambitious operas; but there are standard operas in which the unity is scarcely more than in an opera of this class. Take, for instance, Lucia di Lammermoor. Many of the arias are, at least musically, separate numbers, and recognized as such. Or take classic examples of the same kind of production as this—e. g., Gilbert and Sullivan's operas, where many of the songs hold but the slightest unity with the plot of the piece. Sir Joseph Porter's rise to fame in Pinafore, or the Yum Yum's song to the moon in the Mikado can hardly be said to advance the plot, yet it would be quite unreal to say that their author, had he been other than Sir William S. Gilbert, could have claimed that they were literary productions independent of the whole opera in which he chose to imbed them, and as parts of which they first appeared and got their popularity. I do not think that it is in the least possible to undertake a satisfactory analysis of the extent of the mutual influences between the parts of such a piece. Even if they are not highly organized, at least they are like mosaics from which, though you may lift a stone, it loses the significance of its setting. When several collaborators knowingly engage in the production of a piece which is to be presented originally as a whole only, they adopt that common design, mentioned in Levy v. Rutly, supra, and unless they undertake expressly to apportion their contributions, they must share alike.

The law is scanty upon this point, so far as I have found. In Hat-ton v. Keen, 7 C. B. N. S. 268, the plaintiff, having composed some music for presentation of two of Shakespeare's plays under agreement with the defendant, tried later to collect penalties for infringement. The case did not turn upon any license given by the plaintiff, but upon whether his music had not gone into the fabric of the presentation in such sense that he lost independent ownership. This the court held. The case was much stronger for the separability of the part from the whole than the case at bar, because the music was merely incidental to the plays, which were themselves, of course, not musical. The Queen's Bench followed the Common Pleas in Wallenstein v. Herbert, 16 L. T. N. S. 453, on almost the same case, though Lord Cockburn referred to the fact that the defendant was the plaintiff's licensee. These cases must be taken as declaring, even if it was not essential to the decision, that one who contributes to such a joint production does not retain any several ownership in his contribution, but that it merges into the whole.

[3] With this premised, it follows that when the Smiths took out these statutory copyrights the literary property, which by publication they used and destroyed, was owned jointly by themselves and the plaintiff, and the resulting statutory rights they held in equity upon the same division as existed before. They are accountable to the plaintiff share and share alike, unless she has waived her rights. This she did not do. Her contract with Werba & Luescher gave them only rights of dramatic production under their own management, and left her general property intact. The plaintiff, in my judgment, is right in asserting that they became constructive trustees for her in whatever rights they got, legal or equitable.

[4] Their answer is in part that they relied upon their contract of December 10th with Werba & Luescher. Yet they had the clearest notice of her rights, not only from her, but from Werba & Luescher themselves. It is true they knew she had made a contract, but obviously such knowledge charged them with complete knowledge of its contents. She gave them no false information about her rights; her conduct did not mislead them. Any inference as to the extent of her conveyance was at their own peril under all analogies.

[5, 6] The defendants deny equitable jurisdiction of the court, on the theory that there are no complicated accounts requiring equitable relief. Carter v. Bailey, 64 Me. 458, 18 Am. Rep. 273. If the bill depended upon the account alone, there might be some difficulty under that case; but it does not. As I have said, the plaintiff's rights arise from a constructive trust, created and cognizable only by a court of equity. The statutory copyrights have been acquired through the publication, and so the loss, of certain common-law literary property; i. e., a libretto to which all three parties had contributed. The copyright is the resulting res, and by every equitable rule the defendants hold any legal rights they have upon trust in the same proportion. If it be urged that the publication of the libretto was not with the plaintiff's consent, and that therefore she still holds her interest in the literary property, the answer is that the bill alleges that she gave consent to publication,

but not to the Smiths' acquisition of a copyright to her exclusion, or that, even if she did not consent, and if the absence of her consent avoided publication (a doubtful position), nevertheless the wrongful publication she may now accept and insist upon her proprietary rights in equity, as much as though she had consented at the outset. Her suit, so far as concerns the statutory copyrights, is clearly on the equity side of the court, because at law she could get no declaration of those rights, nor, indeed, could a court of law look at any but legal interests in the copyrights. The case in this aspect is not unlike King v. Barnes, 109 N. Y. 267, 16 N. E. 332, though the subject-matter is different. The bill lies as against a trustee who repudiates the trust and refuses to pay any share of the profits. An accounting is only an incident to such a bill, though it is a proper incident. At most, this objection would only result in transferring the cause under rule 22 to the law side, which the defendants have not asked, and perhaps do not want.

[7] The plaintiff also asks for a declaration of her interest in the remaining literary property held in common, especially the moving picture rights and the dramatic rights for stock companies, which she has not assigned, since to give them Werba & Luescher would have to sublet the dramatic rights. In this literary property the plaintiff is still a co-owner at law with the Smiths, and it is certainly doubtful whether any bill in equity would lie upon it alone, unless for some especial reason. However, equity, having taken jurisdiction for any good reason, will never leave the parties to another litigation finally to determine their controversy, and the decree may properly follow the prayer in a declaration of the plaintiff's interest in the remaining literary property.

The defendants' next objection is that the recovery does not follow the bill. It is true that much of the bill is surplusage—e. g., the charges of fraud, conspiracy, the express division of the royalties into thirds by the contract; but enough is stated to be a foundation for all that is necessary to the equity of the bill. The rest may be disregarded, especially in equity, where there have never been such things as "causes of action," properly speaking.

[8] Another objection is to the jurisdiction of this court, based upon the value of the subject-matter in controversy. The defendants misconceive the rule; the allegation of the bill will serve, unless it clearly appears to the court that the effort was only colorable, and that the value is not $3,000. Barry v. Edmunds, 116 U. S. 550, 6 Sup. Ct. 501, 29 L. Ed. 729; Wetmore v. Rymer, 169 U. S. 115, 18 Sup. Ct. 293, 42 L. Ed. 682; Put-in-Bay Co. v. Ryan, 181 U. S. 431, 21 Sup. Ct. 709, 45 L. Ed. 927; Street, Eq. Proc. §§ 361, 365. The value of the statutory copyrights does not appear. I cannot say that they are clearly worth less than any given sum, but we may count the incidental relief upon this question. Robert B. Smith has already received $5,540, of which one-third is $1,840, and the value of the motion picture rights is certainly $1,000. The stock rights are substantial, and the plaintiff has already received upon the Australian dramatic rights nearly $400 down. Obviously it would be absurd to say that it was clearly proved that the subject-matter in controversy did not equal $3,000.

[9] Finally, the defendants appear to object that the composer of the music is not joined; but this is not made in the answer as an ob-

jection to lack of parties defendant, and it may be taken only as going to the form of the decree. The parties in the agreement of October 3, 1913, long after the play had been written and proved a success, divided the royalties, one-half to the composer, one-quarter to the plaintiff, one-quarter to the two Smiths. The plaintiff does not question the propriety of this division so far as concerns the composer, nor have the Smiths suggested that the librettists were to get more than one-half. However, if the contributors were to share alike, it could not injure the Smiths to give the plaintiff one-third of their recovery. That could hurt them only in case they had agreed with the composer that he should have, as against them, less than one-fourth of the gross receipts, while we know he got one-half. As between the plaintiff and the Smiths they cannot be prejudiced by a decree dividing the whole share of the librettists into thirds. It is true that this is less than the Smiths accorded voluntarily to the plaintiff in the Australian contract, but she does not press that admission.

The decree will be as follows:

1. Declaring G. Schirmer, Incorporated, and Harry B. Smith trustees for the plaintiff in the statutory copyrights already taken out, to the extent of a one-third interest in whatever rights the Smiths have in such copyrights under any agreements with G. Schirmer, Incorporated, or Victor Herbert, the composer.

2. Declaring the plaintiff a co-owner to the extent of a one-third interest with the Smiths in any interest which all three of them may have in the moving picture rights of the opera in question, and in any other literary or dramatic property not copyrighted which has not passed to Werba & Luescher under the plaintiff's contract with them.

3. Decreeing an account against Robert B. Smith of any profits which he may have received from the statutory copyrights; in the account any proper cross-equities may be considered.

4. Appointing William Parkin, Esq., to take and state the account.

5. Awarding costs, except as against G. Schirmer, Incorporated.