## Fisher Estate

*Donald S. Cohan*, for accountant.

*Ramon R. Obod*, for remaindermen.

*James Arthur Ewing*, for guardian and trustee ad litem.

KLEIN, P. J., February 5, 1962.—By irrevocable deed dated July 3, 1952, and amendments thereto dated November 5, 1953, and November 22, 1955, Samuel G. Fisher transferred a total of 112 shares of the capital stock of National Molasses Company to him-

self, in trust for the benefit of his daughter, Edythe Rubenstone, her husband, Joseph Rubenstone, his son, Lester Fisher, and wife, Edna Fisher, and his grandchildren, Elizabeth Rubenstone, Sally Rubenstone, Jane Fernanda Fisher, Mark Lawrence Fisher, and Suellen Fisher, the income from 14 shares to be paid to each of Edythe Rubenstone, Joseph Rubenstone, Elizabeth Rubenstone, Sally Rubenstone, Lester Fisher, and Edna Fisher, and from nine and one-third shares, each, to Jane Fernanda Fisher, Mark Lawrence Fisher and Suellen Fisher, and upon the death of any of these to his or her issue, per stirpes, and in default of issue to be added to the respective shares of the surviving beneficiaries. In the event of the death or incapacity of the settlor-trustee, the deed directed that Edythe F. Rubenstone and Lester Fisher should become successor trustees, and that the trust should terminate upon the death of the last survivor of the trustee and successor trustees, or on January 1, 1977, whichever event should occur first, when it was directed that the corpus should be divided into as many equal parts as there should be then surviving beneficiaries named in the instrument, or surviving issue of any deceased beneficiary, per stirpes. As recited in the statement of proposed distribution, it is not entirely clear whether or not the last dated amendment to the deed allocates a specific number of shares to each beneficiary for purposes of distribution. The deed also provides that the trustee or successor trustees have power to invade principal in such amount as "the trustee shall deem proper in the exercise of his discretion", to meet any demand or emergency of any beneficiary, the settlor, if living, to first approve such consumption of principal. The deed and amendments contain further provisions which it does not appear necessary to recite in this adjudication, as a copy of the deed and amendments is attached to the petition

for reformation thereof, which was filed in this case on July 12, 1961.

The present account has been filed in order to obtain consideration by the court of the aforesaid petition by the settlor for reformation of the trust. Hearings and argument on the said petition for reformation were held on October 11, November 9, and December 6, 1961, as indicated above, at which time the proposed reformation of the deed was submitted to the auditing judge, by the terms of which it was provided that the said 112 shares of the capital stock of National Molasses Company should be held by Samuel G. Fisher, his son, Lester Fisher and his son-in-law, Joseph Rubenstone, as trustees, in continuing trust to pay the income from one-half thereof, 56 shares, to the settlor, Samuel G. Fisher, for life, and to his wife, Irene Fisher, for life, if she survives him, and the income from the other one-half, 56 shares, should be paid 22/56ths to Edythe and Joseph Rubenstone or the survivor of them, 22/56ths to Lester and Edna Fisher, or the survivor of them, 6/56ths equally among the children of Edythe and Joseph Rubenstone, and 6/56ths equally among the children of Lester and Edna Fisher, with the further provision that at the death of both Joseph and Edythe Rubenstone, and Lester and Edna Fisher, the income should go to their issue, per stirpes, and in the event of the death of any grandchild, his income should go to his or her issue, per stirpes, otherwise to his or her surviving parents, or to the issue of his or her parents, per stirpes. The reformed deed also provides for the termination of the trust upon the death of the survivor of Samuel G. Fisher, settlor, and his wife, Irene, when the corpus is to be distributed 22/56ths to Edythe Rubenstone and Joseph Rubenstone, or their survivor, 22/56ths to Lester Fisher, Edna Fisher, or their survivor, 6/56ths, stirpitally, among the issue of Edythe and

Joseph Rubenstone, and 6/56ths, stirpitally, among the issue of Lester and Edna Fisher. If neither Joseph nor Edythe Rubenstone are surviving, their share of the corpus is to go to their issue, per stirpes, and if neither Lester nor Edna Fisher are surviving, their share of the corpus is to go to their issue. The reformed deed also provided that the trustees may invade the one-half of the corpus set aside for the benefit of the settlor and his wife, as may be necessary for their comfort, support, maintenance, health and welfare, and may invade the other one-half set aside for the benefit of settlor's children, their spouses and his grandchildren, as may be necessary for their comfort, support, maintenance, health, and welfare, any such invasion to be charged against the ultimate corpus to be received by the person in whose behalf the invasion was made. A copy of the reformed deed is also attached to the petition for the reformation of the original deed and amendments, which was filed on July 12, 1961, and is presently before the auditing judge for consideration.

Samuel G. Fisher, the settlor, was born in Philadelphia and is 64 years of age. He graduated from grammar school and attended Central High School for one year. At the age of 15 he went to work in an alcohol distillery. He started doing varied menial jobs and gradually advanced until he became superintendent of the plant.

At the age of 20, he married his wife, Irene, who was 19, and they have lived together harmoniously for 44 years. Two children were born of the marriage, a son, Lester, and a daughter, Edythe. Lester is married, his wife's name being Edna. They have three children, Jane Fernanda Fisher, Mark Lawrence Fisher and Suellen Fisher. Edythe is married to Joseph Rubenstone and has two children, Sally Fisher Rubenstone, age nine, and Elizabeth, age six.

Samuel G. Fisher went into the business of fabricating metal equipment in association with Joshua Epstein more than 30 years ago, and the two are still associated in business. The original company has since been incorporated, and is now named Acme Process Equipment Company (hereafter referred to as Acme). They also are associated in a second company, National Molasses Company (hereafter referred to as National). Fisher and Epstein each owned 50 percent of the stock of Acme, and 40 percent each of the stock of the other company, the remaining 20 percent being owned in equal shares of 10 percent each, by Fisher's son-in-law, Rubenstone, and a Sydney Cohen. Rubenstone is chief executive officer of National, and Lester Fisher has been active in one or the other of the two businesses since 1941.

Settlor also has a brother, David, who has been associated with him for many years. David has two sons, Eugene Fisher and Leslie Fisher, both of whom have worked for the companies at various times.

Many years ago settlor developed glaucoma in both eyes, as a result of which he has been almost totally blind since, the right eye having been removed and the nerve of the left eye having atrophied about 85 or 90 percent. In 1947, unsuccessful glaucoma surgery was performed in the Jefferson Hospital. He was admitted to the hospital again in 1950, and in 1954, at which time the hospital record indicates that he had been almost totally blind in his left eye for several years. Over the period of the past 15 years, he has undergone nine operations on his eyes.

In 1952, with the advice and counsel of his then attorney, Fisher executed three deeds of trust and a salary agreement with the shareholders of his two companies, as part of an overall plan disposing of his estate, and placing approximately 95 percent of all of his assets in trust.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Since the terms of all three of the trust agreements, as well as the salary agreement, constitute integral parts of the overall estate plan which settlor is seeking to reform in these proceedings, we will briefly outline the important provisions of each of these instruments.

The terms and provisions of the trust of July 3, 1952, and amendments thereto, of 112 shares of National Molasses Company stock for settlor's son and daughter and their respective spouses and children, and of the proposed reformation thereof, are fully set forth at the beginning of this adjudication.

The trust of July 3, 1952, of 45 shares of National Molasses Company stock is for settlor's brother, David Fisher, and his nephews, Eugene and Leslie Fisher, and their issue, and is in generally similar terms, as is also the proposed reformation thereof. The details of this trust and proposed reformation are fully set forth at the beginning of the adjudication of even date herewith on the account of the trustee thereof (No. 2093 of 1961).

The trust of August 12, 1952, and amendment of November 22, 1955, of 1200 shares of stock of Acme Coppersmithing and Machine Company (now Acme Process Equipment Company) is for settlor's son-in-law, Joseph Rubenstone, and settlor's five grandchildren, and is also in generally similar terms, as is also the proposed reformation thereof. The details of this trust and proposed reformation are fully set forth at the beginning of the adjudication of even date herewith on the account of the trustee thereof (No. 2097 of 1961).

At the time of the creation of the three trusts and the execution, later, of various amendments thereto, Fisher was informed by his attorney, and therefore believed, that he was accomplishing three objectives:

(1) that he was making adequate provisions for income for both his wife and himself for the terms of

their respective lives; (2) that the over-all dispositive scheme embraced by the trust deeds removed all of the trust res from liability for estate taxes at his death; and (3) that the plan of distribution provided by the plan, exclusive of the share placed in trust for his brother and nephews, would result in an equal stirpital devolution between the families of his son and daughter.

The settlor recently engaged the law firm of Korn and Cohan to review the instruments he had executed and for the first time was informed that the complex of trust deeds and salary agreement, which he had executed under mistakes of fact, has failed to accomplish any of the purposes intended by him. The alleged mistakes of fact can be summarized as follows:

(a) the purported salary agreement is unenforceable and since neither the settlor nor his wife are beneficiaries of the various deeds of trust, the over-all plan makes no provision for settlor or his wife; (b) contrary to settlor's intention, under the present deeds of trust, the corpus is very likely to be subject to estate taxes; (c) ambiguities in the deeds of trust appear likely to result in an ultimate distribution of remainders in a manner different from that intended by settlor; and (d) upon the death of the settlor-trustee, the substituted trustees could use their power to invade principal to consume the entire corpus in favor of any of the designated beneficiaries.

The jurisdiction of the orphans' court is entirely statutory in origin: Rogan Estate, 394 Pa. 137, 140 (1958); Smith's Estate, 141 Pa. Superior Ct. 571, 575 (1940). It is a court of limited jurisdiction, exercising only such power as is given by statute, expressly or by necessary implication: Watson's Estate, 314 Pa. 179 (1934); Cutler's Estate, 225 Pa. 167 (1909). Within its appointed orbit its jurisdiction is

exclusive, and therefore necessarily as extensive as the demands of justice: Shollenberger's Appeal, 21 Pa. 337, 341 (1853). Its process is plastic, and its power is limited only by the necessities of the case, and by its duty to administer equity in accordance with established rules. It needs no other court to finish its work: Odd Fellows S. Bank's Appeal, 123 Pa. 356, 365 (1888). See Heinz's Estate, 313 Pa. 6 (1933). When its equitable jurisdiction is invoked, it is sufficient to embrace every relief necessary for a full disposition of the case, because equity abhors multiplicity of suits: Winton's Appeal, 97 Pa. 385, 395 (1881). See also Mellinger's Estate, 334 Pa. 180 (1939).

The legislature in section 304 of the Orphans' Court Act of August 10, 1951, P. L. 1163, reënacted this basic principle in the following language:

"The Orphans' Court shall have all legal and equitable powers required for or incidental to the exercise of its jurisdiction."

Although the Orphans' Court Act, supra, in some respects broadened the scope of the court's jurisdiction: Henderson Estate, 395 Pa. 215 (1959); Rogan Estate, supra; Webb Estate, 391 Pa. 584 (1958); and, in section 301(3), invested it with exclusive jurisdiction over the ". . . administration and distribution of the real and personal property of inter vivos trusts . . .", it did not supply the complete and plenary equity jurisdiction which the orphans' court did not possess theretofore: See Mains Estate, 322 Pa. 243, 246 (1936).

In the present case, Samuel G. Fisher is seeking relief in the nature of reformation of the three deeds of trust, which he alleges he signed as part of a complex of documents premised upon mistakes of fact. Reformation is an equitable remedy and is one of the procedures employed to correct inequities resulting

from accident, mistake and fraud: See Bispham's Principles of Equity (7th Ed.), p. 45. Only a court possessing general equitable powers has original jurisdiction to grant relief by means of reformation.

Since the orphans' court does not possess general and plenary equitable power, grave doubt exists as to whether it has jurisdiction to entertain the petitions filed by the settlor, standing by themselves as an independent proceeding. This is a matter which should receive the early attention of the legislature, as it seems clear that the orphans' court is best equipped by experience and the nature of its work to pass upon all matters pertaining to all problems in connection with inter vivos trusts.

It seems settled, however, that while the orphans' court is without jurisdiction to reform an inter vivos trust upon petition, it does have jurisdiction where an account has been filed for audit in that court by a trustee of such a trust.

In Goldstein's Estate, 29 D. & C. 536 (1937), in which the validity of an inter vivos trust was at issue, our late colleague Judge Stearne, later elected to the Supreme Court, pointed out that once the orphans' court acquires "rightful jurisdiction of a subject it will comprehend that which is within its grasp and decide all matters necessary to enable it to make a full and final determination of the whole controversy, *although in so doing it may adjudicate questions which, if standing alone, would not warrant the assumption of jurisdiction.*" (Italics supplied.)

And again, in Kenin's Estate, 41 D. & C. 572 (1941), when a similar problem was presented to our court, Judge Stearne said at p. 579:

"The jurisdiction of the orphans' court has been challenged to declare such a deed invalid. The orphans' court is a court of equity, with limited juris-

diction: Cutter's Estate, 286 Pa. 505; Watson's Estate, 314 Pa. 179; Mains' Estate, 322 Pa. 243. The Act of June 26, 1931, P. L. 1384, amending the Orphans' Court Act of June 7, 1917, P. L. 363, conferred concurrent jurisdiction over trusts inter vivos: Wilson, Mayor v. Board of Directors of City Trusts et al., 324 Pa. 545, 552 et seq. *When, therefore, the trustee filed its account in this court, the orphans' court assumed complete jurisdiction over the subject matter.* It is a well-settled principle that a court of equity, when its jurisdiction has been invoked for any equitable purpose, will proceed to determine any other equities existing between the parties connected with the main subject of the suit, and grant all relief necessary to an entire adjustment of such subject. And relief of an equitable character may thus be incidentally obtained, when an original bill would not lie for such relief alone: John Curtis & Co. v. Olds, 250 Pa. 320; Broadhurst v. Broadhurst, 248 Pa. 594; Hurst v. Brennen (No. 1), 239 Pa. 216; Gwinn v. Lee, 6 Pa. Superior Ct. 646; Maurel v. Smith, 220 Fed. 195; 21 C.J. 137; 5 Pepper & Lewis Dig. col. 8378: 2 Hunter's Pa. Orphans' Court Commonplace Book, p. 946. This court has, at least on two occasions, similarly ruled: Judge Gest in Comly's Estate, 16 D. & C. 336, 339; Judge Stearne in Goldstein's Estate, 29 D. & C. 536 540 et seq." (Italics supplied.)

All doubts as to this court's jurisdiction have been removed because the settlor-trustee filed three separate accounts, one for each of the trusts he is seeking to reform. These accounts are now before us for audit simultaneously with the three petitions settlor has filed seeking reformation of the trust instruments.

We are, therefore, now in a position to consider the merits of the petitioner's prayer for reformation. A careful study of this record leads us to the inevitable

conclusion that settlor is entitled to the relief he seeks for several cogent reasons.

We will discuss them separately.

## I.

It is clear that settlor was completely mistaken when he thought he was making adequate provision for his wife, Irene, when he was persuaded to adopt the estate plan encompassed in the three trust deeds and the salary agreement.

Mrs. Fisher receives no benefits, directly or indirectly, under the three deeds, as she is not mentioned in any of them as a beneficiary. The salary agreement, under which she is to receive a salary of $275 a week for the duration of her life, upon the death of her husband, the settlor, is clearly unenforceable for two reasons:

(1) The agreement was not made with the two corporations in which settlor had interests, i.e., National and Acme, but with the then shareholders of the two companies in their individual capacities. A corporation is a separate entity from its shareholders, who are without authority to bind the corporation legally: Gordon v. Hartford Sterling Co., 350 Pa. 277 (1944); Green v. Philadelphia Inquirer Co., 329 Pa. 169 (1938); Monongahela Bridge Company v. Pittsburg & Birmingham Traction Company, 196 Pa. 25 (1900).

(2) The only consideration mentioned in the salary agreement is the past service of the settlor to the two corporations which was rendered without any indication that any lifetime salary agreement was in contemplation, and neither Fisher nor his wife agreed to perform any future services in behalf of the two companies.

There is considerable doubt whether such past services constitute sufficient consideration to support a

contract, especially where, as in the instant case, the contracting party had apparently been fully compensated for all past services at the time such services were performed.

(3) The principal argument advanced by Mr. Cohan, settlor's counsel, in support of his contention that the salary agreement is unenforceable is that the contract fails for indefiniteness, since it is impossible to ascertain who the contracting parties are, or to whom the obligation runs. We have scrutinized the agreement carefully and we agree with Mr. Cohan's contentions.

It is well settled that in order to make a contract enforceable, the promise or the agreement of the parties to it must be certain and explicit, so that their full intention may be ascertained to a reasonable degree of certainty: Beachler v. Mellon-Stuart Co., 354 Pa. 341 (1946); Seiss v. McClintic-Marshall Corp., 324 Pa. 201 (1936); McNeely v. Bookmyer, 292 Pa. 12 (1928); Edgcomb v. Clough, 275 Pa. 90 (1922); Ogden v. Philadelphia & West Chester Traction Co., 202 Pa. 480 (1902); Restatement of Contracts, §32; Williston on Contracts (Rev. Ed.) §42.

Since it is evident that one of the primary purposes of the settlor in creating the involved testamentary estate plan before us, was to protect his wife, with whom he had lived happily and harmoniously for his entire adult life, and since she is not a beneficiary under the three trust deeds, it follows that, since the entailed so-called salary agreement is unenforceable, the trusts were created under mistake of fact and on this ground, alone, reformation would be warranted.

## II.

One of the motivating forces which prompted the settlor to commit substantially his entire estate in

trust was to reduce the impact of State and Federal death taxes upon his decease. A citizen has the right to take measures to reduce his liability for all forms of taxation, so long as he employs only legal means.

In paragraph 8(f) of each of the three deeds of trust, the settlor granted to himself, as trustee, the power to invade principal of the trust. The trustee is authorized to:

"expend so much of the principal or corpus of such trust as the trustee shall deem proper in the exercise of his discretion in order to meet any demand or emergency of any beneficiary, when the said trustee shall deem the income from such trust to be insufficient; provided that the settlor, if living, shall first approve of such consumption of principal."

Section 2038 of the Internal Revenue Code (26 U. S. C. A. §2038), provides:

"The value of the gross estate shall include the value of all property . . . To the extent of any interest therein of which the decedent has at any time made a transfer . . . by trust or otherwise, where the enjoyment thereof was subject at the date of his death to change through the exercise of a power . . . by the decedent alone or by the decedent in conjunction with any other person . . . to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death."

This has been construed by the treasury department in T. D. 6292 (June 23, 1958), in the following manner:

"Section 2038 is applicable to any power affecting the time or manner of enjoyment of property or its income, even though the identity of the beneficiary is not affected. For example, section 2038 is applicable to a power reserved by the grantor of the trust to accumulate income or distribute it to A, and to distribute the

corpus to A, even though, the remainder is vested in A or his estate, and no other person has any beneficial interest in the trust."

The decided cases all appear to support this ruling that where the settlor retains, as trustee, the power to invade principal for the benefit of a beneficiary without limitation and without specifying any definite ascertainable standard, it is held to be tantamount to a power to amend, revoke or terminate the beneficial enjoyment of the trust, and thus makes the entire trust subject to estate tax. Michigan Trust Co. v. Kavanagh, 137 F. Supp. 52 (1955); Commissioner of Internal Revenue v. Bridgeport City Trust Co., 124 F. 2d 48 (1941); Biscoe v. United States, 148 F. Supp. 224 (1957); Mollenberg's Estate v. Commissioner of Internal Revenue, 173 F. 2d 698 (1949).

Since one of settlor's principal objects in establishing these trusts was to avoid the impact of estate taxes, and since this object appears likely to fail, because it seems reasonably evident that the trust res will be subject to such taxes, Mr. Cohan maintains, and we think properly, that there has been such a mistake of fact as to warrant the reformation the settlor is seeking.

This aspect of our problem seems to be controlled by Irish v. Irish, 361 Pa. 410 (1949), in which settlor and his wife executed, delivered, and recorded an irrevocable deed of trust whereby real and personal property was conveyed and paid to named trustees, in trust for the benefit of settlor's wife, daughters, grandchild, son-in-law, possible heirs, and next of kin. No provision was made in the deed for disposing of the principal of the trust estate in the event that the settlor should survive all of the named beneficiaries and their issue, if any, and if settlor's daughters, in such event, should fail to exercise a power of appointment

by will, in which contingency the principal of the trust would revert to the settlor by operation of law. Following the decision of the United States Supreme Court, in the great landmark decision, Estate of Spiegel v. Commissioner, 335 U. S. 701, 69 S. Ct. 301, 93 L. Ed. 327 (1949), the settlor filed a bill in equity in the Common Pleas Court of Allegheny County seeking to reform the deed. He alleged that he had intended to avoid the remote contingency above recited, but failed to do so because of the mistake and inadvertence of the scrivener. The lower court ruled that the trust res could, under the circumstances, revert to the settlor and that no interest of any person, known or unascertained, would be affected by the decree prayed for. The court dismissed the bill, however, for the following reason:

"In the light of the Spiegel case it is important that the right to reform instruments in the circumstances here present be determined by the Supreme Court."

On appeal, the Supreme Court reversed the lower court, reinstated the bill and remitted the record for further proceedings. The court said at p. 412:

"We are unanimous that in the event of the happening of the remote contingency recited there would be a reverter. We also agree that under appropriate circumstances a court in equity may reform a deed. Whether the omission in the deed was in truth and in fact a mistake or inadvertence depends upon the findings of fact of a chancellor who sees and hears the witness, and which, if approved by the court in banc, would warrant a decree of reformation."

See also, Stone v. Stone, 319 Mich. 194 (1941), 174 A. L. R. 2d 1349, in which a husband and wife, who each owned a one-half interest in a business, conveyed half of their holdings in trust to their two children so that each member of the family had a one-fourth

share. This was done upon the advice of a tax consultant that the income from the trust would result in income tax savings. A subsequent tax decision made evident that settlor was mistaken and the result he sought was not achieved. The court permitted the parents to set the gifts aside, stating (p. 199) :

" 'But where a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, or estates, and enters into some transaction, the legal scope and operation of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, interests, or estates, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact.' "

See also Scholler Estate, 20 D. & C. 2d 318 (1960), affirmed in Scholler Trust, 403 Pa. 97 (1961).

### III.

The settlor advances as an added reason for reformation that the language of the trust instruments is so ambiguous and conflicting that it is impossible to determine the settlor's intent from the face of the instruments and as a result that intrafamily disharmony and litigation could possibly arise.

We regard this contention as of little weight under the circumstances of this case. It is true that some provisions of the trust instruments might require judicial interpretation. This fact, however, does not mean that the writings should be changed in advance of the date when the questionable provisions became effective.

### IV.

We now come to one of the most important features of these proceedings, namely, the effect of reformation upon the rights of minors and possible unascertained interests.

We should note first that the settlor-trustee and all sui juris persons who have an interest in the matter have acquiesced in the request for reformation.

James Arthur Ewing, Esq., a respected and experienced member of our bar, was appointed by the court as guardian ad litem for all living grandchildren of the settlor and trustee ad litem for unborn and unascertained interests. Mr. Ewing, in a carefully prepared report, after a comprehensive study of the problem, said, inter alia:

"It therefore appears to me that these instruments were executed under a mistake of both fact and law, and that the Court should permit their reformation to carry out the original intentions of the Settlor.

"In reaching this conclusion I have given thoughtful and conscientious consideration to the respective interests of both the Settlor and the minor beneficiaries. Being a voluntary trust without consideration, I believe it only fair and equitable that the Settlor should reserve not only the right to income for himself and his wife, but also the right to invade principal for their proper support and maintenance. With this exception the rights and interests of the minors are very little different from those under the original trust, and in fact in some instances, as pointed out elsewhere in this report, better protected, and the interests of possible unborn issue of life beneficiaries provided for, as they were not in the original trusts."

An examination of the record in this case indicates beyond doubt that the Fisher family is a harmonious one and that settlor's primary concern in establishing the testamentary plan under consideration was to benefit his two children and their issue. The court is satisfied that the rights of the designated minors and such descendants as may be born hereafter are fully protected under the proposed reformation, and any slight disadvantage that might result with respect to

any individual will be more than compensated by the advantages which will accrue to the family as a whole.

There is one overriding factor permeating this entire case which most strongly fortifies our conclusion that settlor is entitled to the relief he seeks. *That is his blindness.* The settlor is a man of very limited education. Under normal circumstances it would be difficult for him to comprehend the complexities of the testamentary plan he created. With his almost complete lack of vision, this difficulty is greatly increased.

We repeat what we said in Friedrich Estate, 26 D. & C. 2d 51, 57-58:

"We must also bear in mind the fact that the entire trust *res* consists of settlor's own money, voluntarily placed in trust by her. Consequently, we must approach this problem in a benign spirit, making every effort to give effect to her obvious intentions. All doubts are to be resolved in favor of the donor whose property has become the subject of the trust. In Schautz Trust, 395 Pa. 605 (1959), Mr. Justice Musmanno said at p. 612:

" 'Fairness dictates that a person who sets up a trust without consideration should not in the end be regarded as a stranger in the realm of his own benevolence. Words used by him in the creation of the trust are not to become weapons against him unless no other interpretation is possible.' See Goodell's Estate, 53 D. & C. 13, 21 (1945)."

If the sympathetic understanding of the court is demanded in cases involving the mere interpretation of inter vivos trusts, how much greater is the call upon our compassion in a case such as this one, in which a blind man applies to us for permission to revise a trust in which all of his assets are tied up in an impractical, unworkable, and economically unsound plan.

We, therefore, conclude that Samuel G. Fisher, the settlor, executed the three deeds of trust before us for

reformation as a result of mistakes of both fact and law, and, in fairness and equity, he should be granted the relief he seeks and the three instruments should be reformed.

The trust assets presently accounted for will accordingly be awarded to the trustees *under the reformed deed,* in trust for the uses and purposes therein provided. . . .

And now, February 5, 1962, the account is confirmed nisi.