## Simmons Estate

*Robert C. Grasberger*, for accountant.

*Louis Mitchell Paul*, for claimant.

*Louis Marion*, for Commonwealth.

KLEIN, P. J., December 12, 1962.—By decree of this court, dated June 10, 1957, Blanche Simmons was adjudicated an incompetent, and George F. Ellison was appointed guardian of her estate.

The present account has been filed because of the death, on November 17, 1960, of the said Blanche Simmons.

All parties in interest appear to have had notice of the audit.

Philadelphia Orphans' Court Rule 142.1 (g) provides:

*"Testamentary Writings.* All testamentary writings of the incompetent found by the guardian, or in the possession of any other person, shall, at the time of the filing of the inventory, be submitted by the guardian or such other person to the Hearing Judge for his inspection, together with a photographic type copy to be retained by the judge for his private file."

To the complete surprise of the auditing judge, counsel produced a photocopy of a formally prepared will on five typewritten pages, apparently executed by Blanche Simmons, the incompetent. Under its provisions her interest in a property in Wildwood, New Jersey, which she inherited from her sister, was devised to Reverend George F. Ellison, the present accountant; and the rest of her estate was left to Reverend Ellison and Lela Flagg as trustees. The trust gave Stanley W. Simmons, Blanche's brother, the income for life with the right to live in premises 127 North Ruby Street, which they owned jointly, for his life. Upon his death, legacies were given in the sum of $500 to St. Ignatius Church and $250 to Reeve Memorial Presbyterian Church. One-half of the balance was bequeathed to Eva Wells, under certain specified conditions and the remaining one-half was bequeathed to Reverend Ellison. It is not necessary to recite the other provisions of the will, as they conform to those usually employed in setting up trust estates.

Ordinarily, in auditing the account of the guardian of the estate of a deceased incompetent who died leaving a will, the balance for distribution would be awarded to the executors, when duly appointed and qualified. Under the circumstances of this case, however, such an award would be futile, because it is clear beyond question that decedent, at no time, possessed sufficient intellect to make a will.

Blanche Simmons appeared before the present auditing judge on two occasions, viz., June 5 and June 10,

1957, in the proceedings to adjudge her an incompetent. She was on the witness stand on both dates, and the auditing judge had the fullest opportunity to study her and form an opinion as to her mental capacity.

She was a small, somewhat microcephalic negress, about four feet eight inches tall, around 50 years of age. She was pleasant but obviously mentally deficient. She had never attended school; thought ten times ten was 20; did not know how much change she would get from a dollar if she bought a loaf of bread for 25 cents. She did not know how many pennies were in a dollar or how much she had to pay to go to the movies. Furthermore, she did not have the slightest notion as to the value of the little house at 127 North Ruby Street, where she lived, and when asked by the court whether she would sell it for a million dollars, she replied that she did not know whether she would.

Her mental deficiency was so obvious that the auditing judge assumed responsibility for adjudging her an incompetent without ordering a medical examination, as is usually required in incompetency cases.

The auditing judge does not have the benefit of formal medical or psychiatric training, but he has had sufficient experience in incompetency proceedings to know that Blanche Simmons was so mentally deficient from birth as to be completely lacking in the degree of understanding required to transact business affairs of any kind or to make a will.

Blanche Simmons obviously manifested strong evidence of primary or congenital amentia, which has been defined as subnormal development of the mind, with particular reference to intellectual capacities. Amentia differs from dementia, which has a wider meaning and ordinarily implies that the individual at one time possessed healthy and relatively intact mental faculties, from which he subsequently regressed.

The terms idiot, imbecile, and feeble-minded are

generally used to designate the degree of mental deficiency in amentia. In the case of idiots, the defectiveness exists to such a degree that they are unable to guard themselves against common physical dangers and have an intelligence quotient (I.Q.) of less than 25. In the case of imbeciles, the mental impairment does not amount to idiocy, yet is so pronounced that they are incapable of managing themselves or their affairs, or of being taught to do so. An imbecile possesses an I.Q. of between 25 and 50. The feeble-minded require care, supervision, and control for their own protection and are incapable of receiving proper benefit from instruction in ordinary schools. They are also referred to as morons and their I.Q.'s may range from 50 upward.*

In the opinion of the auditing judge, Blanche Simmons could be classified as somewhere between an imbecile and feeble-minded.

Our courts have said that a person has testamentary capacity if he has a full and intelligent knowledge of the act that he is engaged in, a full knowledge of the property he possesses, and an intelligent perception and understanding of the disposition he desires to make of it, and of the persons or objects he desires to be the recipients of his bounty: Snyder's Estate, 279 Pa. 63 (1924) ; Ash Will, 351 Pa. 317 (1945).

There cannot be the slightest doubt that Blanche Simmons did not, at any time in her life, possess testamentary capacity.

We are well aware that in Pennsylvania the register of wills has jurisdiction of the probate of wills: Register of Wills Act of June 28, 1951, P. L. 638, sec. 201. This jurisdiction is exclusive and cannot be usurped by the Orphans' Court: Martin Estate, 349 Pa. 255 (1944). "The probate of a will without regard to its

---

*The foregoing information has been obtained from Psychiatric Dictionary (3rd ed. 1960) by Drs. Hinsie and Campbell.

provisions is one thing; distribution of the estate of the testator in accordance with its terms is another. The former is for the register; the latter is none of his concern": Carson's Estate, 241 Pa. 117, 121 (1913). See also Rockett Will, 348 Pa. 445 (1944); Maguire Estate, 25 D. & C. 2d 660 (1961); Mayor Estate, 26 D. & C. 2d 78 (1961).

Nevertheless, the auditing judge is firmly of the opinion that under the unusual circumstances of this case he has full authority to rule that the alleged will of this incompetent is void and of no effect and should not be offered for probate.

In Freihofer Estate, 405 Pa. 165 (1961), the court said at page 168:

"The Orphans' Court is also granted by statute all legal and equitable powers required for or incidental to the exercise of its jurisdiction.

"While it has often been said that the Orphans' Court is a Court of Equity, it is more accurate to say that 'in the exercise of its limited jurisdiction conferred entirely by statute, it applies the rules and principles of equity.' Williard's Appeal, 65 Pa. 265, 267. Mains's Estate, 322 Pa. 243, 247, 185 A. 222. See also: Webb Estate, 391 Pa. 584, 138 A. 2d 435."

When a case is once within the grasp of a court of equity, or a court lawfully exercising equitable powers, it has no need to call in the aid of another tribunal to bring the litigation to a conclusion. The process of the orphans' court is flexible and its powers limited only by the necessities of the case and by its duty to administer equity in accordance with established rules. See Appeal of the Odd Fellows Savings Bank, 123 Pa. 356 (1888); Heinz's Estate, 313 Pa. 6 (1933); Mellinger's Estate, 334 Pa. 180 (1939). Its jurisdiction is necessarily as expansive as the demands of justice. Having taken cognizance of a litigation, it will dispose of every subject embraced within the circle of the contest,

whether the question be of remedy, or of distinct yet connected topics of dispute: Shollenberger's Appeal, 21 Pa. 337, 340 (1853). Equity abhors circuity of action and a court of chancery will accomplish equity directly, rather than indirectly, where it is possible to do so: 30 C.J.S. Equity §43.

In Kenin's Estate, 41 D. & C. 572, 579 (1941), our late colleague Judge Stearne (later Mr. Justice Stearne) said:

". . . When, therefore, the trustee filed its account in this court, the orphans' court assumed complete jurisdiction over the subject matter. It is a well-settled principle that a court of equity, when its jurisdiction has been invoked for any equitable purpose, will proceed to determine any other equities existing between the parties connected with the main subject of the suit, and grant all relief necessary to an entire adjustment of such subject. And relief of an equitable character may thus be incidentally obtained, when an original bill would not lie for such relief alone: John Curtis & Co. v. Olds, 250 Pa. 320; Broadhurst v. Broadhurst, 248 Pa. 594; Hurst v. Brennen (No. 1), 239 Pa. 216; Gwinn v. Lee, 6 Pa. Superior Ct. 646; Maurel v. Smith, 220 Fed. 195; 21 C. J. 137; 5 Pepper & Lewis Dig. col. 8378: 2 Hunter's Pa. Orphans' Court Commonplace Book, p. 946. This court has, at least on two occasions, similarly ruled: Judge Gest in Comly's Estate, 16 D. & C. 336, 339; Judge Stearne in Goldstein's Estate, 29 D. & C. 536, 540 et seq."

The proceedings before us involve a matter of distribution. In what manner, and to whom, shall the balance of this incompetent's estate be awarded? Since it is clear that Blanche Simmons did not possess testamentary capacity, the writing in question could not properly be admitted to probate. If it were, by chance, probated, it would be the court's duty to direct the substituted guardian appointed for Stanley Simmons, her

brother, to appeal to this court, in which case the probate would surely be set aside. In order to prevent circuity of action, which would unnecessarily involve this small estate in considerable additional expense, the auditing judge will strike directly at the root of the problem and rule that the writing, bearing date April 1, 1953, purporting to be the will of Blanche Simmons, is null and void by reason of the fact that she did not possess testamentary capacity on the day the will was made, or at any time in her life, before or after that date.

The auditing judge therefore enjoins George F. Ellison, the guardian, from offering said writing for probate, and, further, enjoins the register of wills of Philadelphia from accepting said writing for probate, if so offered. George F. Ellison, the guardian, is ordered and directed to deliver said writing to the court, so that it may be attached to the record and made a part hereof.

Recognizing the invalidity of the alleged will, Reverend Ellison and the other beneficiaries thereunder executed formal instruments in which they acknowledged that Blanche Simmons "lacked the requisite mental capacity to make a valid will" and assigned all of their interests in the estate "to those who would properly inherit the same under the Intestate Laws of the Commonwealth of Pennsylvania." These assignments have been filed with the court and are made part of this record.

Since the alleged will has been declared invalid, it follows that decedent died intestate, leaving as her next of kin entitled to her estate under the intestate laws, her brother, Stanley Simmons. However, no useful purpose would be served by having letters of administration granted upon Blanche's estate as more than two years have elapsed since her death which occurred on November 17, 1960. Although section 613 of the Incom-

petents' Estates Act of 1955 provides that no claims other than necessary administration expenses shall be passed upon at the audit of a guardian's account, no problem is created here because the funeral bill, which is obviously the only claim for which the incompetent's estate can be liable, has been compromised for $300.

Credit is taken in the account for payment of $137.50 to George F. Ellison for his services as guardian. Although Dr. Ellison is a respected minister, the manner in which he conducted himself as guardian makes it necessary to deny the compensation he claims. In the consent to his appointment as guardian, Dr. Ellison stated that "he has no interest adverse to the alleged incompetent." It now appears that Dr. Ellison held a mortgage, in the amount of $2,000, secured on 308 West Schellenger Avenue, Wildwood, New Jersey, which the incompetent and her brother, Stanley Simmons, who was also adjudged an incompetent, inherited from another sister who had been caring for them. Reverend Ellison had great difficulty in proving that the full amount of this mortgage was actually advanced by him. Moreover, after his appointment as guardian, he attempted to purchase the property, personally, for a sum less than its actual value. As recited above, Reverend Ellison is one of the principal beneficiaries under the wills, executed by the deceased incompetent and her brother, Stanley, and prepared with his knowledge, although he knew that neither of them had testamentary capacity. Under all these circumstances, the auditing judge is firmly of the opinion that Reverend Ellison did not faithfully perform his duties as guardian and he is therefore surcharged the sum of $137.50 for which he has claimed credit in the account. . . .

And now, December 12, 1962, the account is confirmed nisi.